UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TONY J. CAYUELA | No. 18 CR 836-1<br><br>Judge Jorge L. Alonso |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**[1]

In 2018, after more than twenty years in and out of the criminal justice system, including previous cocaine convictions, defendant was wire-tapped by the FBI while he operated his door-to-door cocaine delivery business. Based on his conduct during those 60 days of interceptions—which uncovered two drug phones, four wholesale suppliers, two drivers, and hundreds of customer contacts—defendant's guideline range is 100 to 125 months of imprisonment. The government recommends a sentence of 110 months of imprisonment to account for defendant's criminal history, his role running a drug trafficking organization, and the quantity of narcotics he delivered to users.

---

[1] The government apologizes for the late filing of this sentencing memo, which was the result of the undersigned's failure to re-calendar the due date after the most recent continuance. The government explained the oversight to defense counsel, and does not anticipate an objection to the late filing of this sentencing memo.

1

## BACKGROUND

### A.     Personal and Criminal History

Defendant was born in California but grew up grew up in Chicago, living in Humboldt Park and Albany Park, among other neighborhoods. PSR ¶¶ 74, 76. His parents divorced in 1991, when he was approximately twelve years old. PSR ¶¶ 74, 76. He attended two years of high school between 1994 and 1996, eventually earning his GED in 2000. PSR ¶¶ 108-09. During his teenage years, he was arrested thirteen times, resulting in five convictions, including aggravated assault. PSR ¶¶ 38-42.

Defendant reports that he did union construction work between 2001 and 2008, and was a CDL truck driver for logistics companies between 2005 and 2010. PSR ¶ 122. Defendant was married between 2002 and 2010. PSR ¶ 81. His ex-wife obtained and emergency order of protection against him in 2010, and a plenary order of protection in 2011. PSR ¶ 51.

Between 1999 and 2011, defendant was arrested six times (in incidents that did not result in convictions), including for battery, domestic battery, and disorderly conduct. PSR ¶¶ 64-69. In 2010, defendant was arrested and convicted of possession of a controlled substance in DuPage County. PSR ¶ 45. According to the arrest report in that case, defendant had nine bags of white powder cocaine with him in his vehicle, after selling one to a confidential source.  PSR ¶ 45. In 2011, while defendant was on bond for that case, defendant was caught with eight grams of cocaine after being

2

attacked in a bar fight. PSR ¶ 47. He was sentenced to probation in both cases. PSR ¶¶ 45, 47.

In 2012, while on probation, defendant was arrested and convicted of committing an accident involving death or injury, and his probation was revoked on his 2010 and 2011 cases, resulting in a two-year sentence. PSR ¶¶ 45, 47-48. In the 2012 case, the allegations were that defendant was in a dispute with another driver and struck his vehicle. PSR ¶ 48. A passenger in defendant's vehicle brandished a handgun at the victim driver, and the victim heard gunshots as he was chased by defendant. *Id*. Defendant struck the victim's vehicle again, causing the victim to strike a scaffolding, and a window cleaner fell 25 feet to the ground, fracturing his pelvis and spine. *Id*. Defendant received a sentence of one year of imprisonment, consecutive to his two-year term. *Id*.

While defendant was in prison, he became a father to a son who is now nine years old. PSR ¶ 82. Defendant was released from prison in 2013, and returned to construction work between 2014 and 2017. PSR ¶¶ 120, 122. He was charged in 2014 and 2015 for the domestic battery of his brother, resulting in orders of protection but no convictions. PSR ¶¶ 70-71. In 2016, defendant bought his own residence on South Kedzie Avenue, and also purchased another nearby residence, 3740 South Kedzie, to convert into rental units. PSR ¶ 120. He also managed sixteen units in a building on South Western Avenue that he purchased in 2017 with Muhammad Sabih, who was a defendant in *United States v. Anees Usmani*, 18 CR 835. GVO Ex. 1 ¶ 73.

3

Before the investigation of this case, defendant was an employee and business partner of Anees Usmani. PSR ¶ 9; GVO Ex. 1 ¶ 11. In 2017, Usmani was arrested and charged with delivery of cocaine. Ex. A Tr. at 36, 41. Around that time, defendant obtained defendant's phone contacts and set up his own operation as described below. *Id.*; R. 245 at 6.

### B. Instant Offense

By 2018, defendant ran a drug trafficking organization that distributed cocaine to hundreds of customers throughout the Chicago area. Defendant packaged wholesale quantities of cocaine into one-gram bags for retail sale, and dispatched drivers to complete deliveries to customers. Co-defendants Tony F. Cayuela and Walberto Olivo worked as delivery drivers for defendant's retail trafficking business. Defendant also bought and sold wholesale amounts of cocaine in transactions with Anees Usmani, Jesus Hernandez, Muhammad Sabih, and Juan Bautista Dominguez.

Defendant used a cell phone to communicate with retail customers ("retail phone"), and another cell phone to communicate with his delivery drivers, wholesale suppliers or customers, and other associates ("operation phone"). For example, on the morning of August 17, 2018, defendant spoke with Olivo on the operation phone, and asked him if he was ready to "work" and "pick up this pack," meaning distribute cocaine for defendant. After the call, Olivo picked up over 24 grams of cocaine from defendant at his residence on Kedzie, where defendant mixed and packaged narcotics.

4

That afternoon, defendant spoke to a customer named "Alex" on the retail phone and told him that "the Rican," meaning Olivo, would be making cocaine deliveries that day. Defendant then called Olivo on the operation phone and told him to go to Alex's location in the South Loop of Chicago. Olivo confirmed that he was on his way, but then later called defendant, stating that he pulled over because of car trouble near 22nd and Canal. Law enforcement approached Olivo's vehicle and seized 29 individually wrapped packages of cocaine with a net weight of 24 grams.

During the two 30-day periods in which defendant's cell phones were monitored by law enforcement (May 8, 2018 through June 6, 2018, and July 23, 2018 through August 20, 2018) his drug trafficking operation delivered at least 1,082 grams of cocaine to retail customers in approximately 632 individual transactions.

Defendant was supplied by Dominguez on a number of occasions, and had phone calls with him discussing the quantity and quality of cocaine (which they referred to as "cars" or "food") in July and August 2018. For example, on August 21, 2018 at approximately 1:47 p.m., defendant called Dominguez and asked if he was ready for him, and Dominguez confirmed that he was. Defendant drove to the car wash where Dominguez worked and received cocaine from him. Shortly after he left, law enforcement pulled over defendant and recovered a plastic bag containing a net weight of 28 grams of cocaine from his front pants pocket.

During the four 30-day periods in which defendant's and Usmani's phones were monitored by law enforcement in 2018, defendant bought or sold at least 632 grams

5

of cocaine in wholesale transactions with co-defendant Jesus Hernandez, Dominguez, Usmani, and Muhammad Sabih.

Between 2016 and 2018, defendant maintained and controlled a JP Morgan Chase bank account ending in 1711. The account had a "Chase Quick Pay" function which enabled other individuals to transfer money to the 1711 account through Chase's website or a smartphone application. Between December 2016 and July 2018, defendant's narcotics customers transferred at least $27,900 into the 1711 account through Chase Quick Pay.

During this time period, on or about June 19, 2017, defendant wired $59,000 from the 1711 account to Title Company A for the purchase of 3740 S. Kedzie Avenue in Chicago, Illinois. At all relevant times leading up to this transaction, the vast majority of defendant's funds were derived from the drug trafficking organization described above.

On April 14, 2018, texted a friend a photograph of what appears to be a Glock pistol sitting on a large amount of cash with sunglasses and key fob:



GVO Ex. 2. On the day of his arrest on December 13, 2018, defendant possessed in his residence a Glock 22-G4, .22 caliber semiautomatic firearm, with a twenty-two round capacity magazine and seventeen .22 caliber bullets.

## GUIDELINES CALCULATION

Defendant objects to the four-level enhancement for being an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive under Guideline § 3B1.1. This enhancement is correctly applied because defendant's drug trafficking organization ("DTO") had five or more participants, was extensive, and he had complete and sole control over it.

Defendant's criminal organization had five or more participants (defendant, his father, Olivo, Hernandez, Dominguez, Sabih, and Usmani) and delivered cocaine to "hundreds of customers" in the Chicago area. PSR ¶¶ 9-11. Defendant appears to

7

contest the legal application of this enhancement on the basis that he only employed two delivery drivers, R. 245 at 3, but his suppliers should be counted as well. *United States v. Zuno*, 731 F.3d 718, 723 (7th Cir. 2013) ("A 'participant' is someone 'who is criminally responsible for the commission of the offense" and includes suppliers in conspiracy).

Defendant argues that "while Mr. Cayuela did assist Anees Usmani as a worker in the narcotics conspiracy that Anees Usmani created, he was not a leader or organizer of the Usmani conspiracy." *Id.* at 2. But the PSR properly applied this enhancement to *defendant's* drug trafficking organization, which he ran as a competitor of Usmani's. As he acknowledges in his argument on this point, defendant "started a much less extensive 'copy-cat' drug business" like Usmani's in which "packaged drugs himself, took orders and delivered drug to customers" while "eventually employ[ing] two other defendants to assist him with deliveries." R. 245 at 3. The fact that defendant's three suppliers—Usmani, Sabih, Dominquez—also supplied Usmani does not mean that they cannot also be members of defendant's DTO. *United States v. Lovies*, 16 F.4th 493, 506 (7th Cir. 2021) ("the defendant's criminal organization is not required to have a formal structure for the role enhancement to apply"). In addition, even if all defendant's suppliers were not counted, the vast reach of his delivery business makes it "otherwise extensive." *United States v. Diekemper*, 604 F.3d 345, 354 (7th Cir. 2010) ("3B1.1 does not require a minimum headcount to find that a criminal scheme was otherwise extensive").

8

The Guidelines offer "seven factors that are relevant to the question whether a leadership enhancement is appropriate: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control or authority exercised over others." *United States v. Andersen*, 988 F.3d 420, 428 (7th Cir. 2021) (citing USSG § 3B1.1, cmt. n. 4).

All these factors apply to defendant—he controlled his DTO by obtaining wholesale quantities from suppliers, catered to hundreds of customers using one cell phone, deployed drivers using another cell phone, determined the drivers' share of the profits, and then laundered the profits through his Chase Quick Pay account into a real estate transaction. *United States v. Sunmola*, 887 F.3d 830, 839 (7th Cir. 2018) (holding that defendant was an organizer or leader where he "recruited accomplices, placed the orders for merchandise, found the stores where the merchandise could be picked up, acquired the phony credit card data used to make the purchases, received the stolen goods and wire transfers, and directed everyone else on what to tell the victims" and "commanded a larger share of the profits"). Therefore the enhancement was properly applied. PSR ¶ 24.

**ARGUMENT**

The government concurs with the United States Probation Office's recommendation of 110 months' imprisonment, followed by five years of supervised release. Defendant's guidelines range of 100 to 125 months is not excessive. In fact, the quantity that defendant is being held accountable for—1,082 grams—is a conservative estimate based solely on the 60 days in which the FBI was intercepting defendant's phones. PSR ¶ 10.

Defendant argues that his potential sentence is based on the "mistaken belief that drug quantity relates to an offender's role in the offense and thus his culpability." R. 245. Even if that argument has traction in other cases, it does not here. Defendant played a personal role in delivering each and every gram, over the course of 632 transactions, to his list of hundreds of customers. Defendant was in direct contact with these victims over the phone and by sometimes making deliveries himself. As a cocaine user himself, he knew how dangerous this drug is, and the effect it has on the lives of users, yet he kept feeding their addictions. This is not a situation, for example, where a courier is being held accountable for a large drug quantity over a lengthy conspiracy, despite no direct knowledge of the quantity, on the basis that the quantity was "reasonably foreseeable."

Defendant also argues that "[t]he consensus today is that lengthy prison sentences are not an effective deterrent." R. 245 at 10. Judge Chang responded to a similar argument in Usmani's sentencing, and observed that social science studies *do*

10

*not* "establish that the length of a sentence has no general deterrence effect," but rather "these social scientists believe that certainty has more of a deterrence effect, not that there's zero deterrence effect in a lengthy sentence." Ex. A Tr. at 73-74. The relevance of this social science research, Judge Chang pointed out, "applies more to policymakers" rather than "picking individual sentences." *Id.* at 74. In sentencing Usmani to 96 months' imprisonment, Judge Chang noted, "I have no doubt that if it became known that the federal judges in the Northern District of Illinois were giving slaps on the wrist for drug crimes that drug crimes would increase." *Id.* at 75. The same reasoning applies to defendant.

Defendant ran this business when he was almost 40 years old, after a lengthy criminal history in which he had multiple opportunities to rethink his course in life. When his friend and business partner Usmani was charged with cocaine trafficking in 2017, and Usmani's operation was temporarily derailed, defendant could have used that as an opportunity and a reason to walk away from drug trafficking. Instead, defendant decided to use Usmani's customer phone numbers to operate his own door to door cocaine delivery business.

The government acknowledges defendant's point about unwarranted sentencing disparities, given that Usmani received a sentence of 96 months imprisonment. Usmani ended up with a guidelines range of 87 to 108 months based on a quantity of 2.1 kilograms of cocaine, and a Criminal History Category of III. Ex. A Tr. at 28. Usmani had a larger organization than defendant in terms of drivers

11

(four), wholesale suppliers or customers (six including defendant), and other "helpers" (four) including his brother, girlfriend, ex-wife, and a friend. Usmani had a factor in mitigation, however, that does not apply to defendant. Usmani was facing deportation to Pakistan or Afghanistan, and had lived in the United States since high school when his parents brought him here, which Judge Chang found "somewhat mitigating." Ex. A Tr. at 42, 73.

The government recognizes that avoiding sentencing disparities is a factor under 18 U.S.C. § 3553(a), but it is only one of several factors that the government takes into account in making its recommendation. In the Usmani case, the government initially recommended a sentence in its guidelines calculation of 168 to 210 months' imprisonment, then revised that recommendation to 120 months based on Judge Chang's lower guidelines calculation. Ex. A at 36. Here, the government's recommendation of 110 months' imprisonment is consistent with its position in the Usmani case, in that it recognizes that Usmani had a larger quantity and more charged co-conspirators, but also that defendant engaged in similar conduct.

## CONCLUSION

For the reasons set forth above, the government recommends that defendant be sentenced to 110 months imprisonment, followed by five years of supervised release, with the conditions recommended by the United States Probation Office.

       Respectfully submitted,

       JOHN R. LAUSCH, JR.
       United States Attorney

By: /s/ *Charles W. Mulaney*
   CHARLES W. MULANEY
   Assistant U.S. Attorney
   219 South Dearborn St., Rm. 500
   Chicago, Illinois 60604
   (312) 469-6042

Dated: December 6, 2022

13