UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

TONY J. CAYUELA

No. 18 CR 836-1

Judge Jorge L. Alonso

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

# Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4              Plaintiff,            )
                                      )
 5              v.                    )  No. 18 CR 00835
                                      )
 6   ANEES USMANI,                    )  Chicago, Illinois
                                      )  September 30, 2020
 7              Defendant.            )  3:00 p.m.

 8          TRANSCRIPT OF PROCEEDINGS - Sentencing hearing
               BEFORE THE HONORABLE EDMOND E. CHANG
 9
     APPEARANCES:
10
     For the Plaintiff:           HON. JOHN R. LAUSCH, JR.
11                                United States Attorney
                                  BY:  MR. RAJNATH P. LAUD
12                                Assistant United States Attorney
                                  219 South Dearborn Street, Suite 500
13                                Chicago, Illinois 60604
                                  (312) 353-5300
14                                rajnath.laud@usdoj.gov

15   For the Defendant:           PISSETZKY LAW
                                  BY:  MR. GAL PISSETZKY
16                                35 East Wacker Drive, Suite 1980
                                  Chicago, Illinois 60601
17                                (847)736-7756
                                  gal@pissetzkylaw.com
18
     ALSO PRESENT:                MS. REBECCA FOWLIE,
19                                United States Probation Office

20   ALSO PRESENT TELEPHONICALLY:

21                                MS. KATHY KIRIKLAKIS,
                                  United States Probation Office
22
     Court Reporter:         Judith A. Walsh, CSR, RDR, F/CRR
23                           Official Court Reporter
                             219 South Dearborn Street, Room 2118
24                           Chicago, Illinois 60604
                             (312) 702-8865
25                           judith_walsh@ilnd.uscourts.gov
```

1        (Proceedings heard in open court:)

2            THE CLERK:  18 CR 835, USA versus Anees Usmani.

3            THE COURT:  All right.  Can I get the appearance of

4    the government?

5            MR. LAUD:  Yes.  Good afternoon, your Honor.  Raj

6    Laud on behalf of the United States.

7            THE COURT:  All right.  Defense counsel?

8            MR. PISSETZKY:  Good afternoon, your Honor.  Gal

9    Pissetzky for Mr. Usmani who's sitting beside me.

10           THE COURT:  All right.  Good afternoon.

11           And for Probation?

12           PROBATION OFFICER FOWLIE:  And good afternoon again,

13   your Honor.  Rebecca Fowlie on behalf of the probation

14   department.

15           THE COURT:  All right.  Good afternoon to you as

16   well.

17           Okay.  We are here for sentencing.  Is the government

18   ready to proceed?

19           MR. LAUD:  Yes, your Honor.

20           THE COURT:  And the defense?

21           MR. PISSETZKY:  Yes.

22           THE COURT:  Okay.  Mr. Usmani, I'm going to start

23   with you.  I just want to make sure you've had enough time to

24   prepare for today's sentencing.  And as I asked you awhile ago

25   now, I'm going to also ask about whether you're still

1   satisfied with Mr. Pissetzky's representation of you.  So

2   because you'll be answering these questions and making

3   statements in court, you do have to be put under an oath to

4   tell the truth.

5           And I'll ask the courtroom deputy to do that now.

6           THE CLERK:  Would you please raise your right hand?

7       (Defendant sworn.)

8           THE DEFENDANT:  Yes.

9           THE CLERK:  Thank you.

10          THE COURT:  All right.  Okay.  So first, have you had

11  a chance to read the presentence report in the case?  It had

12  information about you, about the offense, about the sentencing

13  guidelines, your employment record, and so on.

14          THE DEFENDANT:  Yes.

15          THE COURT:  All right.  And have you had a chance

16  also to prepare for today's sentencing by talking with

17  Mr. Pissetzky about the case?

18          THE DEFENDANT:  Yes.

19          THE COURT:  And are you still satisfied with his

20  representation of you in this case?

21          THE DEFENDANT:  Yes.

22          THE COURT:  For example, has he spent enough time

23  with you in preparing for today?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And when you've asked him questions, did

1    he at least try to answer them?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Okay.  All right.  That's all I have for

4    you for right now.

5              On the presentence report itself, other than the

6    objections and corrections that were filed in writing which I

7    believe basically was, there was one typo and then the defense

8    objected to the drug quantity and the gun enhancement.  Other

9    than those, are there any other objections or corrections?

10   For the government?

11             MR. LAUD:  No, your Honor.

12             THE COURT:  Mr. Pissetzky?

13             MR. PISSETZKY:  No, your Honor.

14             THE COURT:  All right.  Then other than those

15   objections, I adopt the presentence report as based on

16   reliable and detailed information.

17             But on the corrections, I believe Paragraph 74, the

18   government pointed out in a footnote that there's a graduation

19   year that is probably off by a decade.  And let's see.  Was

20   it -- maybe it was in Paragraph -- which paragraph was it?

21             MR. LAUD:  Your Honor, I believe it was Paragraph 72.

22             THE COURT:  72.

23             MR. LAUD:  Let me just open up my PSR.

24             THE COURT:  Okay.  No --

25             MR. LAUD:  It's not --

1      THE COURT:  It's '91.

2      MR. PISSETZKY:  Yes.

3      MR. LAUD:  '91.  I see it.

4      THE COURT:  All right.  I might have mis-transposed

5  it myself.  Okay.  So you think the graduation year was 1995?

6      MR. LAUD:  I think that's approximately when he

7  graduated from high school, your Honor.  And that's my

8  supposition.  But I don't have independent knowledge of when

9  he graduated.

10      THE COURT:  Mr. Pissetzky?

11      MR. PISSETZKY:  That's correct.  He -- that's when he

12  finished high school.  He never really received his high

13  school diploma.  And he actually recently has got his GED.

14  But that's the right date, 1995.

15      THE COURT:  Okay.  So let's -- because the BOP will

16  want to know this.  So let's change that sentence to say, "The

17  defendant recalled attending Mather High School in Chicago,

18  Illinois, and his last year of attendance was 1995."

19      And then is the GED information in here somewhere?

20      MR. LAUD:  I don't believe so, your Honor.  I don't

21  recall seeing that.

22      THE COURT:  Was this something recent, Mr. Pissetzky?

23      MR. PISSETZKY:  Yes.

24      THE COURT:  While he's been detained here?

25      MR. PISSETZKY:  Correct.

1    THE COURT:  I see.  And -- okay.  So let's do this.

2  Can you --

3    MR. PISSETZKY:  And he received his GED September

4  28th, 2020, so just a couple of days ago.

5    THE COURT:  Okay.  And that's from the MCC?

6    MR. PISSETZKY:  Yes.

7    THE COURT:  All right.  Does he have verification of

8  that there?

9    THE DEFENDANT:  Yes.

10    THE COURT:  Okay.  So let me ask, rather than hand

11  things during the pandemic, if you can -- Mr. Pissetzky, are

12  you comfortable taking something from him?

13    MR. PISSETZKY:  Yes.

14    Can you take it out?

15    THE COURT:  All right.  So why don't you, after the

16  hearing, just scan it in and email it to the probation office,

17  to the government, and you might as well email it to me as

18  well.  And then if the probation office, you know, is able to

19  verify this, then we'll include another sentence in the

20  presentence report.  All right?

21    MR. PISSETZKY:  Sure.

22    THE COURT:  Okay.  Then let's talk about the drug

23  quantity and the gun enhancement.  So obviously, I've read the

24  back and forth which is quite detailed.  And does either side

25  want to add additional argument or emphasize anything in

1    particular?  For the government?

2         MR. LAUD:  Your Honor, I think for the government, I

3    just do want to emphasize that it's a broad range of 5 to 15.

4    And for all the reasons we've argued, I think 11 kilograms is

5    a very conservative estimate.  It's clearly over the 5.

6         And as to whether or not this was truly relevant

7    conduct as addressed in the defendant's response to the

8    government's sentencing memo, I would just note that this

9    crime actually has a fairly unique method of drug distribution

10   involving the retail phone line, drivers going out to deliver

11   cocaine.  And that's exactly what Mr. Usmani described all of

12   that 11 kilograms of conduct being.

13        So the defense relied on some cases involving

14   somebody who had sort of very disjointed drug dealing or drug

15   dealing that was very different in character.  And this is

16   really the same ongoing business that the defendant operated

17   throughout the entire time period leading to the 11-kilogram

18   conservative quantity estimate.  So that's all properly being

19   treated as relevant conduct here.

20        THE COURT:  So on that -- so if I credit what he said

21   in the post-arrest interview in terms of how long and how he

22   was dealing on and off and the average quantities, whether --

23   it is a separate question whether it constitutes relevant

24   conduct.  At least in the brief, I saw very few details on the

25   similarity and regularity and so on.

1          Is the post-arrest interview somewhere in the

2    government's version or in the record?

3          MR. LAUD:  The post-arrest is summarized in the

4    government's version.  I don't believe that the video

5    recording or the 302 of the entire interview is a part of the

6    government's version which I could supplement.  My

7    understanding is again the character of the dispute was more,

8    should this be treated as relevant conduct.

9          I will say, we also have the -- I'm trying to think

10   of the right way to articulate this.  But at least from the

11   time period of the wire investigation through the time period

12   of Mr. Usmani's arrest, there's references to the ongoing

13   retail nature of the business.  There's also his phone was

14   recovered, and there's evidence from that.

15         So I suppose that if additional facts are necessary

16   to resolve this dispute then that may be something we need to

17   provide your Honor with more information.  But I will say

18   that, I mean, it's very clear from the defendant's admissions

19   and the descriptions of the transactions that are contained in

20   the government's version that his business when he has been

21   selling drugs has been the retail cocaine distribution

22   business using the drivers, using the workers.

23         Some of the drivers continued -- who have already

24   been sentenced by your Honor continued working for him after

25   the wiretap period ended, and their admissions in the plea

1    agreement your Honor can accept.  There are specific instances

2    of larger quantities of drug trafficking like the 500-some

3    kilograms that were recovered from Mr. Usmani's home during

4    the wiretap investigation, and I have not included those in

5    the 11-kilogram estimate.

6            THE COURT:  Right.  I understand that.  I think the

7    question is going all the way back to 2008 is --

8            MR. LAUD:  Yes.  And I'm sorry, your Honor.  The drug

9    quantity, 11 kilograms is not based on going all the way back

10   to 2008.

11           THE COURT:  Well, I think the calculation was it's

12   about ten years, and we'll do two years of that just to have a

13   conservative estimate.

14           MR. LAUD:  Yes.

15           THE COURT:  Right.  But if it started in 2008 and was

16   on and off for those ten years, at least the brief -- I think

17   you supplied the video of the post-arrest to the probation

18   office as part of your version.  I don't have and did not ask

19   for the video.

20           The brief does not give the kind of detail about even

21   him admitting -- so you're saying he admitted in the

22   post-arrest interview that he's been selling on and off from

23   either 2007 or 2008, let's call it 2008 to shorten the time

24   period, and that it was the same kind of operation where he

25   had drivers delivering cocaine or something else?

1      MR. LAUD:  No, it's something else, your Honor.  The

2  admissions in the post-arrest about the operation of the

3  drivers delivering cocaine relates to the time period that

4  we're considering as relevant conduct, I would say after his

5  state case, his state conviction.  And then he also made

6  admissions regarding the conduct that underlie that state

7  conviction which was similar.

8      One difference that comes to mind is that he was

9  using taxi drivers for the conduct in the state case, and the

10  sort of use of taxi drivers does not form part of this

11  conspiracy.  And so we have tried to cabin it to the conduct

12  after the state case for a number of reasons including the

13  state case did seem to result in a temporary disruption in

14  Mr. Usmani's drug trafficking.

15      I think he described Tony Cayuela either being given

16  or taking his dispatch phone that he used for the old

17  business, and Mr. Cayuela kind of took some of those old

18  customers.  And so then when Mr. Usmani started back up again,

19  he had to essentially reestablish himself.

20      So I'm not arguing that conduct going back prior to

21  his state case should be considered relevant conduct.  I will

22  obviously talk about it when we get to the 3553(a) factors.

23  I'm just focusing on the two-year period after he's caught and

24  it leads to the state prosecution.

25      MR. PISSETZKY:  So what year -- I'm sorry, your

1    Honor, but I'm confused at the years that the government is

2    talking about.

3         MR. LAUD:  2016 through 2018.

4         THE COURT:  Okay.  But I had thought based on the

5    written filings that what the probation office proposed was to

6    say his admission was that he on and off since 2008 has been

7    dealing and on average, it's four ounces of cocaine per week.

8    And so then the probation office said, all right, even if only

9    two years out of that ten years is considered because he

10   did -- he did say in the post-arrest that it was on and off.

11   All right.  So even if you take one-fifth of that time, you

12   get to 11 kilograms by multiplying out four ounces over -- per

13   week for a two-year period of time.

14        So is that the methodology that the probation office

15   used?

16        PROBATION OFFICER FOWLIE:  I believe you're correct

17   in your assessment, your Honor.

18     (Pause.)

19        THE COURT:  Okay.  All right.  So let me invite the

20   probation officer who authored the report to announce her

21   appearance.  I believe she just joined the phone conference.

22        PROBATION OFFICER KIRIKLAKIS:  Yes, your Honor.  Good

23   afternoon.  Kathy Kiriklakis, U.S. Probation.

24        THE COURT:  Okay.  And then, so Officer Kiriklakis,

25   can you tell me whether I accurately set forth how you got to

1    11 kilograms?

2         PROBATION OFFICER KIRIKLAKIS:  Your Honor, I

3    apologize.  I joined a few minutes late because I was in

4    another hearing.

5         THE COURT:  Yes.  So the presentence report proposes

6    about 11 kilos of cocaine as relevant conduct.  And I had

7    thought, but please correct me if I'm wrong, that the way you

8    arrived at that was to say in his post-arrest statement,

9    Mr. Usmani admitted that since around 2008, he had been on and

10   off dealing cocaine and that on average, he dealt four ounces

11   per week which if you multiply that out over 104 weeks, which

12   is two years, to try to use a conservative estimate in light

13   of the fact that he said it was on and off, that you get to 11

14   kilos that way.

15        So is that the methodology you used?

16        PROBATION OFFICER KIRIKLAKIS:  Yes, your Honor.  That

17   is what we used.

18        THE COURT:  Okay.  So then I think the question,

19   Mr. Laud, is if that is the methodology that generates the 11

20   kilos, then do we have enough information about what the

21   dealing was like in 2008 and 2009 and so on?

22        MR. LAUD:  Your Honor, I think I misunderstood what

23   the probation office intended.  I took two years to mean the

24   time period after he was arrested in the state case which in

25   his post-arrest interview, he acknowledges disrupted him for a

1   time period, he was not running this operation, and then he

2   resumed.

3          There was not an indication in that interview that

4   after he resumed that it was interrupted or the business, you

5   know, wasn't running pretty much consistently during that time

6   period.  So I was focused on the two years leading up to his

7   arrest in this case.  The state case, there's a fair amount of

8   description in the PSR.  And I think there was some discussion

9   of it in the post-arrest interview as well discussing the use

10  of dispatch drivers and things like that.

11         Going back to 2008, I agree with your Honor, I don't

12  think that there is evidence in the record to suggest that

13  conduct in 2008, 2009 were well before his arrest on the state

14  case was similar in character to what he was arrested for

15  here.  So that was not what the government was intending to

16  rely on and didn't rely on his delivery driver operation which

17  resumed after his arrest on the state case.

18         THE COURT:  Okay.  Then I think I'm not sure that

19  that four ounces per week applies to this shorter time period

20  that you are focused on.  And, yes, even just the other pleas

21  and what people were saying they delivered, can you really get

22  to four ounces a week?

23         MR. LAUD:  So I think so, your Honor.  Another way of

24  getting at this same question is to look at the seizures

25  during the wire period.  And so that's on Page 6 of the

1   government's memo.  So if we look, we have a total of the

2   defendant receiving about 2.1 kilograms of cocaine over the

3   two months of wire interceptions.  So it's another way of

4   getting at that.

5          And again, I excluded that larger quantity just

6   because it, you know, could have been a one-off as opposed to

7   part of his regular course of dealing.  And then that would

8   support a quantity of 6.4 kilograms in 2018 alone

9   extrapolating those -- January through March from the wire

10  interceptions across the rest of the year.

11         So I think when you look at what was detected on the

12  wire interceptions it's -- I think defendant's estimate was a

13  good estimate and is consistent with what.  It comes out

14  actually very close because 6.4 times two to get to the two

15  years would be 13 kilograms, just a little bit more than what

16  defendant estimated.

17         MR. PISSETZKY:  I learned yesterday from watching the

18  debate not to interrupt, so I'm waiting patiently.

19         THE COURT:  Yes.  Please continue to wait patiently.

20  I just want to understand like the probation officer's and the

21  government's theory before getting your two cents.

22         So you're basically taking the two months of wire

23  interceptions which yielded around 2.1 kilos of cocaine and

24  then multiplying that over two years?

25         MR. LAUD:  Well, I'm using it to corroborate

1  defendant's statement.  I mean, absent defendant's statements

2  that that's how it worked and that it was consistently about

3  this quantity, I wouldn't simply multiply that out over that

4  time period.  But I'm saying that when you look at the

5  snapshot in time when you have a really comprehensive view of

6  what his activities were from the wire interceptions, that's

7  consistent with the estimate of the per-week quantity that the

8  probation officer used in the probation officer's calculation.

9  And I apologize for the confusion of it being any two

10  years within that time period.  I thought we were talking

11  about the two years at the end leading up to the arrest in

12  this case, but I think either way the estimate is accurate and

13  consistent with what we saw Mr. Usmani doing during the period

14  of wire interceptions.

15  THE COURT:  Yes.  I mean, I guess if the four ounces

16  per week, if that was accurate as an estimate, then why didn't

17  I see larger drug quantities with respect to the

18  co-defendants, the drivers that were helping out and so on?

19  MR. LAUD:  So the drivers were largely a rotating

20  cast of characters, your Honor.  And then we only had the

21  drivers held accountable for the cocaine that they actually

22  distributed.  So at any given time, there were three or four

23  drivers, sometimes more, sometimes less.  So they then also

24  have a corresponding fraction of the cocaine because they're

25  only -- they were only held accountable for the cocaine that

16

1    they delivered.

2         And for most of the drivers, we only had evidence

3    regarding the two months or so that we had wire interceptions

4    in the case.  So it was a narrower period of time.  And in

5    addition, it was a slice of Mr. Usmani's conduct.  And then,

6    you know, the drivers that were charged in this case were not

7    necessarily the same people who were driving for him, you

8    know, in the previous year.  Some drivers did cover a larger

9    time period, but others were not.

10         THE COURT:  All right.  Mr. Pissetzky?

11         MR. PISSETZKY:  Your Honor, first and foremost,

12   relevant conduct is -- and it's straight out of 1B1 point --

13   1.3, is all acts and omissions committed, aided, abetted,

14   counseled by, caused by the defendant and jointly undertaken

15   criminal activity that were within the scope of the jointly

16   undertaken criminal activity, in furtherance of that activity,

17   and reasonably foreseeable in connection with that activity

18   that occurred during the commission of the offense of

19   conviction.

20         Now, what we have here, and the government just

21   admitted to it, it could have been another conspiracy.  It

22   could have been other conduct that might -- that Mr. Usmani

23   had -- was doing and he admitted to during his very long

24   statement and then a proffer that we had with the government.

25         And incidentally, if the government is agreeing with

1    what Mr. Usmani is saying, I'm not sure why they have been so

2    resistant in agreeing to give him a 5K(1) reduction because

3    they tell me on the one hand --

4              THE COURT:  A 5K(1)?

5              MR. PISSETZKY:  Yes, a cooperation agreement because

6    I took him in to cooperate.  And he gave them a full

7    statement --

8              THE COURT:  Here.  One second.

9              Officer Kiriklakis, are you still there?

10             PROBATION OFFICER KIRIKLAKIS:  Yes, your Honor.  I

11   am.

12             THE COURT:  Okay.

13             MR. PISSETZKY:  He gave the statement, the

14   post-arrest statement, which was very detailed, and then he

15   gave --

16             THE COURT:  Can I just interrupt you for a moment

17   because I don't -- obviously, I have no authority to require

18   the government to enter into a 5K.  And he's not safety valve

19   eligible, right?

20             MR. PISSETZKY:  He's not safety valve.

21             THE COURT:  So that's not really an issue as to what

22   Mr. Laud's personal feelings are about his -- the defendant's

23   credibility one way or the other.  And it's also easy to

24   imagine that for inculpatory statements that increase his

25   liability that they are willing to believe that because it's

1    an admission against interest whereas other statements are

2    not.  So let's skip that part, please.  And also, please do

3    focus on --

4          MR. PISSETZKY:  I'm --

5          THE COURT:  -- not so much the jointly undertaken

6    activity because we're not talking about a vicarious liability

7    situation here.  It's whether or not this is part of the same

8    course of conduct or common scheme or plan.  I don't think

9    it's common scheme or plan.  At most, it would be same course

10   of conduct under 1B1.3.  So that's the pertinent form of

11   relevant conduct.

12         MR. PISSETZKY:  Right, but --

13         THE COURT:  So for that, I do -- I am concerned that

14   I don't know enough about the other dealing that makes up all

15   these 11 kilos to tag Mr. Usmani with it.  I do have some

16   concerns about that.

17         MR. PISSETZKY:  Right.  And so just as a simple

18   example, your Honor, the government claims that the suppliers

19   for Mr. Usmani -- and they all pled guilty.  Their plea

20   agreements are all in public record, and I printed them all

21   out and they were all before you.

22         His suppliers, there are three suppliers.  Juan

23   Dominguez, Ron Allen or Ronald Allen, and Neil Bowen, they

24   admitted that they were supplying Mr. Usmani between January

25   2018 and March 2018.  The government did not provide any other

1   information, not to me or anybody else, that they were

2   supplying Mr. Usmani prior to that or for a period of two

3   years or whatever the government is claiming today.  In their

4   plea agreements, they agreed to the amount of drugs that they

5   supplied Mr. Usmani during the time that they were supplying

6   him.

7          Now, I believe the government would agree that the

8   drivers would drive the drugs that Mr. Usmani was supplied by

9   these individuals.  So if you take a look at their plea

10  agreements, Dominguez admits to a total of 916 grams.  Ronald

11  Allen agrees to a total of --

12         THE COURT:  735.

13         MR. PISSETZKY:  -- 735.

14         But if you look at the examples in the actual plea

15  agreement, there's only 319 grams.  But even if we take the

16  735 --

17         THE COURT:  Yes, that's because he doesn't have the

18  concrete examples, but he admits it's at least 735.

19         MR. PISSETZKY:  Right.  And then Bowens supplied my

20  client twice for a total of 742.  That's 2.3 kilos which is,

21  if you look at Mr. Usmani's statement where you take, let's

22  say you believe he made $10,000 a week and he -- which means

23  100 grams per week multiplied by 23 weeks, that's 2.3 kilos.

24  It's the exact amount of drugs that Mr. Usmani admitted in his

25  statement and his suppliers admitted that they provided him

1    which shows that that's exactly what he got within that period
2    of time.

3            There is no other -- and the government is trying to
4    extrapolate or add more.  There isn't any more.  There's
5    nothing that the government provided us to show that there is
6    more, that it was from the same suppliers.  I think in his
7    statement, he talks about different suppliers that he had
8    years ago.

9            He also admits that Tony Cayuela stole the majority
10   of his clients.  And towards those 23 weeks of the indictment,
11   he wasn't doing much.  The fact was that he had to call
12   somebody -- the CI which is what the government arranged for
13   this half a kilo deal on February 1st of 2018, Mr. Usmani
14   couldn't get it for weeks where finally he was able to get
15   that on February 1st.  And he had to go through two people,
16   Kevin Slaughter and Neal Bowens, to get it.  And then he
17   couldn't even get rid of it because they still found drugs in
18   his apartment that were sitting there.

19           So it is actual proof that Mr. Usmani was not
20   concentrating or was not selling drugs as he may have done in
21   years past, before his state case, or whatever it was in the
22   past.  But for the purposes of this criminal activity that he
23   was charged in this case --

24           THE COURT:  Yes.  So let me just interrupt again.
25   It's -- the government is not saying that for the criminal

1    activity charged in this case that the quantity exceeds the

2    2.3 kilos.  What the government is saying is that under the

3    guidelines, because conduct that is part of the same course of

4    conduct can qualify as relevant conduct and, therefore, it has

5    to be considered under the guidelines.

6           So for conduct to qualify as the same course of

7    conduct, it need not be the charged conspiracy.  It does,

8    though, have to have a sufficient degree of similarity,

9    regularity.  Some kind of overlap in geography is helpful.

10   You know, the type of drugs is also helpful.

11          And I -- without the post-arrest statement, I do have

12   some concern that I cannot make this finding where it hooks

13   the -- that admittedly he's admitting that it's an average of

14   four ounces per week.  But at least as presented to me right

15   now, that was when he was talking about this on and off ten

16   years.

17          MR. LAUD:  Your Honor, and I think I can clarify that

18   somewhat by what's summarized in the government's version of

19   the offense.  And if we want to go beyond what's in the

20   government's version of the offense, then I suppose I would

21   ask for the opportunity to bring certain parts of the

22   recording to your Honor's attention.

23          But when he talks about that whole time period, and

24   this is on Page 7 of the government's offense, he doesn't say

25   that it's four ounces per week over the entire time period.

1    He discusses his earlier time period around 2009 and discusses

2    it being a much larger quantity then, approximately nine

3    ounces per week earning $25,000 gross income per week.

4         And then he says in more recent years, he sold an

5    average of four ounces per week charging about $100 per gram

6    and about $10,000 gross income per week.  So he is consistent

7    with the other evidence in this case I believe discussing in

8    that time period his more recent drug dealing activities.

9         And I do want to respond briefly to Mr. Pissetzky's

10   point about the suppliers and what they supplied him because I

11   think we're actually in agreement on this.  And I believe it

12   supports the government's position.  Those suppliers did not

13   make admissions covering time periods beyond the time period

14   of wire interceptions.  Mr. Pissetzky is absolutely right that

15   we did not give Mr. Usmani a cooperation deal and as a result,

16   we are not in a position to use Mr. Usmani's admissions

17   against those other individuals.

18        And one more point on that.  I think that the common

19   thread here is Mr. Usmani and his retail distribution

20   operation, and the suppliers are just that.  They are the sort

21   of source of influx.  And so I don't believe for it to qualify

22   as relevant conduct that he would have to have the exact same

23   suppliers.  If we were talking only about, you know, sort of

24   large wholesale deals, I could see that argument but here,

25   we're talking about an ongoing course of dealing.

1          With respect to his, what I would describe as almost

2     like a side business of brokering these larger transactions,

3     the ones involving the cooperating source, that is talking

4     about obtaining a much larger quantity of cocaine.  As set

5     forth in the government's version, to keep the retail

6     operation operating, Mr. Usmani needed a few ounces at a time,

7     maybe four and a half ounces, that type of thing.  Now we're

8     talking about 500 grams.

9          And so it's not surprising that when he steps outside

10    of his usual business that it takes a little more time, but he

11    was able to obtain that cocaine.  And we know again that's

12    part of ongoing conduct because he offered to do it back in

13    October of 2017.  That's also set forth in the government's

14    version.  Ultimately, that transaction didn't go through.  The

15    one in 2018, in February of 2018 did, and then the wire

16    interceptions followed.

17         So I think that all corroborates the concept that

18    Mr. Usmani -- and I'll talk about this in 3553 factors.  He's

19    not getting a cooperation deal here, but I think he deserves

20    credit for being forthright during that interview about the

21    scope of his drug dealing, estimated the rate of which he sold

22    drugs very consistently with the objective evidence about the

23    rate at which he sold drugs which we've now talked about three

24    or four different ways.  And even over just that two-month

25    time period in early 2018 gets us to right around 2 kilograms

1   of cocaine.

2          If your Honor is concerned about it, I'm happy to

3   detail the evidence showing that he was engaged in that course

4   of conduct both after the wires and before the wires, but that

5   is already, you know, a third of the way there to the five

6   kilograms that triggers this higher threshold.

7          So I think that Mr. Usmani's statements are detailed

8   enough.  I understand your Honor's concern, and if you'd like

9   the government to highlight particular portions of that

10  statement and play the recordings at a hearing, I would be

11  happy to do that.  I will be frank, I'm not prepared to do

12  that today, and so I would ask for a short continuance in

13  order to be able to do that.  But I think what is in the

14  record supports the probation officer's determination just

15  relying on these two years after the state offense.

16         And I apologize.  One more thing as a footnote.

17  Mr. Usmani did proffer.  Nothing I'm saying today is based on

18  the proffer.  I'm only relying on what he said in the

19  post-arrest interview.

20         THE COURT:  Okay.  So yes, I don't think a

21  continuance is warranted in light of the fact that, you know,

22  he already has to quarantine when he goes back and to do that

23  again is I think not fair to him.  And his family is here as

24  well.  And so we just have to live by -- just as I would do to

25  the defense, if you don't have quite all the ammunition, you

1   know, ready for today's hearing, then that's the way it goes,

2   and we just need to move forward today.

3          The other thing I will say is that a lot of this

4   discussion revolves around whether or not this is relevant

5   conduct.  And specifically, I do think it's whether it's part

6   of the same course of conduct.  That does not mean that I'm

7   disabled from considering other drug dealing based on his

8   post-arrest statement for 3553 purposes.

9          And this is one of those rare times where something

10  doesn't qualify for a -- for guidelines purposes that the fact

11  that the guidelines are not advisory -- or are advisory now

12  ends up potentially not working in the defendant's favor.  You

13  know, usually the advisory guidelines, it works in the

14  defendant's favor because now you overlay 3553 and almost

15  always, at least in this district and my practice is it ends

16  up being lower than the guidelines sentence.

17         But here, even if it's not relevant conduct, I can

18  take into account the fact that there is a post-arrest

19  admission, which I know you've resisted and I've read your

20  filing on that, but that there is other drug dealing that is

21  not relevant conduct but under 3553, I can consider that in

22  light of the fact I have to consider his personal history and

23  the risk of recidivism and so on.

24         MR. PISSETZKY:  I agree with you.

25         THE COURT:  All right.  So I do think even with the

1   explanation that the government has just provided, the fact

2   that there is a lack of precision -- and obviously, this is

3   just all reasonable estimates and it's a preponderance

4   standard.  But there is a lack of precision on what that --

5   these four ounces per week was going to.  You know, more

6   recent years is also still kind of fuzzy.

7         And I don't think that even on preponderance that

8   there is -- I have sufficient factual detail to connect this

9   other drug dealing from the post-arrest statement to the

10   actual count of conviction.  Like I said, I can consider it

11   for 3553 purposes, but I don't think that the relevant conduct

12   satisfies, that standard is satisfied.

13         What that means is -- and again, I've read the

14   written filings on this, that what the defendant has conceded

15   as 2.3 kilos, which is the way I get there is that

16   Mr. Dominguez's plea to 916 grams.  And the plea, I do credit

17   the under-oath plea.  It is under oath.  He did not get a

18   cooperation deal.  So every gram that he puts on himself in

19   that plea agreement increases his exposure.  So there's very

20   good reason to credit the admission in the plea.

21         Mr. Allen said 735 grams at the least.  That's also

22   in an under-oath plea, not a cooperation deal.  And so again,

23   he's hurting himself by increasing the number of grams.  So I

24   take that as true as well by a preponderance.  And that's 1.65

25   kilos.

1    Now, technically because the defendant pled to the
2    conspiracy, even the Bowens deals has to be considered
3    relevant conduct.  That is relevant conduct, though, because
4    that overlaps the time period exactly in this early 2018 time
5    period.  It's cocaine.  The deal happens at Mr. Usmani's
6    condo, you know, where cocaine was discovered in March of
7    2018.  So I don't think there's any question that that is
8    relevant conduct.  That actually gets it up to 2.1 kilos of
9    cocaine and --
10    MR. LAUD:  Your Honor, I apologize.  I don't mean to
11    interject -- well, I did interject.  I apologize for
12    interjecting.  It won't change the guideline range if you're
13    going where I think you are, but if we are calculating it in
14    this way, then I do think that the 558 grams recovered from
15    Mr. Usmani's condo in March of 2018 should also be separately
16    added in.
17    I had not included that for the risk of double
18    counting with his estimate when we were relying on his
19    estimate, but that cocaine does not appear to have come from
20    Mr. Dominguez or Mr. Allen who never admitted to supplying him
21    in that quantity.  So I -- it won't change the guideline
22    range, so maybe it's a moot point.
23    THE COURT:  Right.  My --
24    MR. LAUD:  But there's an additional 558 grams of
25    cocaine during that time period.

1          MR. PISSETZKY:  Your Honor, I'm not sure -- I don't

2    have it in front of me, but I don't believe -- was it ever

3    tested?  Because my understanding is that it was cut.

4          MR. LAUD:  It was tested.  I don't know the -- off

5    the top of my head how diluted it was, but I do know that that

6    doesn't matter for the sentencing guidelines.

7          THE COURT:  But is it the case that -- so he brokered

8    the 492 gram deal on February 1 with Bowens, but was he -- and

9    then the CS, the CS took all of that.

10         MR. LAUD:  The CS took all of that, your Honor.

11   That's correct.

12         THE COURT:  So then it can't come from there.  Okay.

13   And it can't come from -- right.  It can't come from Dominguez

14   or Allen because they were not supplying in those quantities.

15         MR. LAUD:  And, your Honor, maybe I don't need to ask

16   you to make a finding on that because you're at 2.1, and that

17   would put us at 2.6 roughly which is within the same guideline

18   range.  So I think maybe I'll just note it as additional

19   support for the calculation I believe your Honor is about to

20   make.

21         THE COURT:  Okay.  All right.  So that's a base

22   offense level of 26 then based on the 2.1 kilos of cocaine.

23         All right.  On the gun increase, again, is there

24   anything that either side wants to highlight?

25         MR. LAUD:  Only, your Honor, that in calls about the

1  gun, there's reference to it being fully loaded, calling it a

2  pull.  It's not simply referred to as a burner.  So I don't

3  dispute that a burner could be referring to a burner phone,

4  but for the reasons set forth in the briefing, I think it's

5  pretty apparent that it was referring to a gun here.

6  THE COURT:  All right.  So let me ask you the --

7  because I do think based on that wiretap affidavit despite the

8  arguments that the defense made at least in the written filing

9  that clearly Mr. Usmani and the courier are talking about a

10  gun.  In fact, the courier even says the words, like, "I can't

11  keep doing this, this shit without no gun," all right, when

12  he's talking about that someone had took -- taken stuff from

13  him.

14  So the crucial question, though, is whether or not

15  Mr. Usmani actually ended up providing a gun.  And the crucial

16  paragraph on that in the wiretap affidavit is Paragraph 33.

17  And I understand there's some calls after the fact, but the

18  calls are certainly probable cause that there was a gun

19  transfer from Mr. Usmani, but whether it's a preponderance is

20  a closer question.

21  And so let me -- if you don't have that wiretap

22  affidavit in front of you, Paragraph 33 says, "Based on

23  interceptions over Target Phone 1 and information provided by

24  a confidential source, CS-5" -- and there's a footnote, but

25  that just describes the criminal history of CS-5 -- "I believe

1   Usmani and Individual A met inside Subject Premises 1 that

2   evening to conduct a narcotics transaction and transfer the

3   above-described firearm supplied by Cayuela."  So and then

4   there's the call afterwards which says that, "I got the pull."

5         But, you know, as the defense points out, it is a

6   little odd for him to announce back to Usmani that he got

7   the -- he got the firearm when supposedly he got the firearm

8   from Usmani as part of that drug deal.  So Paragraph 33, that

9   is kind of fuzzy there because it just says "on information

10  provided by CS-5."  What information?

11        MR. LAUD:  Your Honor, I agree with what you're

12  saying.  I think if we were only dealing with that firearm, it

13  would be a closer question, but there's the second gun, the

14  gun that was stored by Mr. Usmani in the home of Lisa Usmani

15  where Mr. Usmani would store and package narcotics, plus the

16  fact that if a courier is driving around for Mr. Usmani

17  carrying a gun, even if he obtained that gun from somebody

18  other than Mr. Usmani, I think that that is -- you know,

19  that's very much foreseeable to Mr. Usmani, he was trying to

20  get it for him.

21        So I think the most straightforward way to actually

22  get to the enhancement and the one that I think is the most

23  significant is the gun that was recovered from Lisa Usmani's

24  home.  I acknowledge that her admission that Mr. Usmani

25  provided it to her is -- could be considered self-serving.  I

1   think it is self-serving.  It wouldn't be good for her if it

2   were her gun.  But when you talk -- when you look at the fact

3   that Mr. Usmani has -- you know, clearly, I find the

4   characterizing it as an attempt.  I think the agent's

5   conclusion was probable cause, but I understand your Honor's

6   concern.

7           His attempt to provide a gun to a courier, the fact

8   that that courier did end up with a gun and then that the gun

9   stored at Lisa Usmani's home, a place where Mr. Usmani also

10  stored narcotics, also packaged narcotics, also had Lisa

11  Usmani package narcotics which she admitted, shows that he

12  possessed firearms as part of this offense.

13          THE COURT:  Yes, my -- I do have a concern as you've

14  identified and predicted that Lisa Usmani did have an

15  incentive to try to put the gun on Mr. Usmani because

16  obviously, it was found in her actual residence and so -- and

17  she's cooperating.  And so she does have this incentive to put

18  the gun on him.  And, of course, as usual there are no

19  fingerprints and no ownership records that would otherwise

20  connect the gun to Mr. Usmani.

21          And it's -- you know, I think a reasonable jury, like

22  if you went to a jury on this kind of question, they might

23  find if you have enough circumstantial evidence when you

24  combine these two things, but they are -- they are different

25  events.  And one is very specific to mid-January 2018 and

1    then -- yes, and so I don't know if there really is a

2    sufficient connection so that you can kind of combine them as

3    circumstantial evidence and get over the preponderance

4    standard.

5         Like I said, this is easily probable cause, you know,

6    that there was a transfer from Mr. Usmani to this courier, but

7    I don't know whether it's a preponderance.  And then the idea

8    that this unidentified courier, I have some concern there that

9    to then hold Mr. Usmani vicariously liable for that gun being

10   possessed in connection with the offense.

11        All right.  Mr. Pissetzky, do you want to say

12   anything?

13        MR. PISSETZKY:  Your Honor, it seems like you read my

14   submissions.  The only thing I want to point out is that even

15   the phone call with Tony Cayuela that the government points

16   out didn't happen right after this alleged courier asked for a

17   pull.  It happened five hours later.  So it wasn't even -- and

18   then this courier calls ten days later to tell Mr. Usmani, "I

19   have a pull."

20        So the lingo is different.  The timeframe is very

21   long in between.  And like I said in my submission and you

22   said as well, why would this person call my client and tell

23   him, "I have a pull" if he just gave it to him?

24        THE COURT:  Yes.  I mean, that's a fair point.  I

25   mean, the counterpoint is that it's almost like social working

1   here because he -- the courier is complaining about, you know,

2   he's got a family, "I can't get robbed like this, it's really

3   dangerous," and then Mr. Usmani offers the gun.  I don't know

4   whether he actually transferred it, but the -- it could be the

5   courier just saying -- because he literally says, "I'm back on

6   track, you know.  I got the pull."

7         So it's almost like he's giving feedback back to the

8   guy who maybe provided the gun as like, look, you know, it's

9   almost -- that's like a thank-you.  However, that is missing

10   from the call that, you know, "I got the pull.  Thanks for

11   that."  There's no -- there's nothing else reflecting in that

12   call that suggests that Mr. Usmani actually provided that gun.

13   And I would have expected something like that.

14         And yes, it's plumbing the depths of the psychology

15   of someone who we don't even know who that person is to

16   explain why it is he'd be telling Mr. Usmani about the gun.

17   It's very unstable ground.

18         MR. LAUD:  Your Honor, if I could just return to the

19   gun that was in Lisa Usmani's home.  I think that the

20   change --

21         MR. PISSETZKY:  Mr. Usmani never packaged anything in

22   her house.  He wasn't -- he doesn't even remember the last

23   time he was at her house, and there's no timeframe for -- and

24   she never gives a timeframe of when he supposedly gave her

25   this gun.

1    MR. LAUD:  I think she did, your Honor.  And I have

2  to consult the filing.  I believe it was actually fairly close

3  in time to when it was recovered.

4    Your Honor, I'm not going to rely on the date because

5  it doesn't appear in the PSR, but I'll just note I think the

6  gap in time between January and December here would be much

7  more significant if we were saying it was the same firearm.

8  The question is, is Lisa Usmani's statement that it was

9  Mr. Usmani's firearm credible, acknowledging, of course, that

10  she has some motive to lie.  It is Mr. Usmani who runs the

11  drug operation.  It is Mr. Usmani who has previously at a bare

12  minimum attempted to procure a firearm for a courier.  It's

13  Mr. Usmani who has acknowledged that a courier, you know,

14  should have a firearm if he wants one.

15    And as your Honor noted, I think, you know, again

16  this is not a case at trial but your Honor gestured, I

17  believe, towards the jury box and said could a jury putting

18  these two things together conclude that there was enough

19  circumstantial evidence.  I think when you step it back to the

20  standard of a preponderance of the evidence here, it does meet

21  that threshold based on the actual physical gun that was

22  recovered on takedown day from the home of Lisa Usmani.

23    THE COURT:  All right.  Yes.  I mean, my reference to

24  the jury was not to elevate the standard of -- the burden of

25  proof but to, that you have to carry the -- only to say that

1   reasonable minds can differ on this, I think.  Like, yes,

2   another judge in this courthouse looking at this evidence may

3   very well say that, yes, you've done it by a preponderance,

4   but I am reluctant to do those -- to do so because for all the

5   reasons I've stated in terms of the credibility issues with,

6   you know, a cooperator plea that where a defendant is stuck

7   with that inculpatory evidence because they possessed it in

8   their house and now they do have a natural incentive to try to

9   blame someone else.  And the calls just don't really lay out

10  that the transfer actually happened from Mr. Usmani.

11          Okay.  So I understand why you made the argument, and

12  there was certainly probable cause in the wiretap affidavit to

13  lay that out, but I'm going to reject the gun enhancement as

14  well.  All right.  Because I have rejected that as a factual

15  matter and not because of some guidelines principle, then this

16  will not factor into the 3553 analysis.

17          So that leaves us with the offense level being -- the

18  base is 26.  Four levels are added for organizer/leader of a

19  criminal activity, five or more participants.  That's an

20  offense level of 30.  Three levels are taken off for

21  acceptance of responsibility.  So that's a total adjusted

22  offense level of 27.

23          So based on those findings, is that square with the

24  government's calculations?

25          MR. LAUD:  Based on those findings, yes, your Honor.

1       THE COURT:  All right.  And then Mr. Pissetzky?

2       MR. PISSETZKY:  Yes, Judge.

3       THE COURT:  All right.  On the criminal history

4   category, I don't think there was any objection there.  And

5   the 2001 -- I'm sorry.  Let's just go over the ones that

6   picked up points.

7       So possession of 15 grams or more of cocaine picked

8   up one point.  The 2017 delivery of cocaine picked up one

9   point.  And then two points are added because he was on

10  probation for the 2017 delivery at the time of this offense.

11  So that's four points.  That's criminal history category III.

12  So the advice of the guidelines is 87 to 108 months.

13      Okay.  Let's hear 3553 factors from the government

14  first.

15      MR. LAUD:  Yes, your Honor.  I suppose I need to

16  start by adjusting my recommendation in light of your Honor's

17  findings.  And while I think a sentence within the previously

18  called-for guideline range would be the right sentence, I

19  think it would actually represent a substantial variance from

20  the advisory guidelines sentence your Honor has calculated.

21      So in light of that, I'm going to suggest that your

22  Honor impose a sentence of 120 months which is the sentence

23  that is recommended by the probation officer because I think,

24  you know, that would only be modestly above the guideline

25  range that your Honor has calculated.  And I don't think I'm

1   in a position to ask for a substantially above-guidelines

2   sentence.

3           THE COURT:  Yes, although the probation officer

4   recommendation was also in light of the --

5           MR. LAUD:  No, I agree, your Honor.  But I think on

6   the substance, we're going to be in a very similar place

7   because -- I'll talk about the offense more generally but, you

8   know, as to which drug trafficking counts as relevant conduct

9   and which does not, at the end of the day there's little doubt

10  that Mr. Usmani has been a very substantial drug dealer for a

11  very long period of time and importantly, a period of time

12  that was interrupted by a state arrest and conviction for an

13  offense as set forth in the PSR, dispatching drivers to make

14  retail cocaine deliveries, very, very similar to the offense

15  that he was convicted of here and which had no impact on his

16  behavior whatsoever.  In fact, as set forth in the sentencing

17  memo and some of the excerpts and the wiretap calls is

18  essentially something that Mr. Usmani mocked.

19          This is a very serious offense.  This is an offense

20  of exploitation.  And Mr. Usmani exploited just about

21  everybody who crossed his path.  The most obvious and most

22  significant are the addicts that he sold the drugs to.  And

23  your Honor has commented before at sentencings on what a

24  staggering quantity of doses this amounts to.  And that's

25  certainly true even of the more cabined drug quantity your

1    Honor found as relevant conduct. And it's certainly true
2    under 3553 when you look at the amount of drug dealing that
3    Mr. Usmani has admitted doing.

4         And I think it's fair for the 3553 factors to look
5    beyond the two-year, the two-year excerpt of 11 kilograms but
6    to look at the entire time period and to look at the fact that
7    Mr. Usmani also admitted that at times, he was selling
8    substantially more drugs than the rate that he was selling at
9    the time he was apprehended for this offense.

10        That represents a staggering quantity of harm to the
11   community. And it's over a very extended period of time,
12   which is aggravating. It's greatly aggravating because this
13   is not a mistake. This is not being the victim of
14   circumstances. This is not something that was done at a, you
15   know, particularly stressful time in Mr. Usmani's life or when
16   he was under particular external pressures.

17        This was done as a way of life to make money and to
18   live a lifestyle that Mr. Usmani was very proud of, whether
19   it's bragging about being the grandfather of drug dealing on a
20   wiretap call or, you know, sitting down -- and I absolutely
21   believe he should get credit for forthrightly acknowledging
22   his drug trafficking in the post-arrest interview, but for
23   laying that all out on the table; whether it's, you know,
24   driving, you know, the Mercedes G wagon, the flashy SUV, or
25   the Mercedes sedan that he bought for his girlfriend, Wesam

1   Fattah, one of the co-defendants in this case; the music
2   videos which were self-aggrandizing in which he, you know,
3   invested substantial proceeds.

4           It was a flashy lifestyle.  It was a lifestyle that
5   Mr. Usmani wanted to live.  And that's why he exploited those
6   drug addicts to whom he was selling drugs.

7           But it wasn't just the addicts.  If you go one step
8   up the chain to the drivers, look at the people that
9   Mr. Usmani used.  And I think "used" is the right word.
10  They're responsible for their own actions.  They've pled
11  guilty.  They received punishment from this court.  They've
12  been sent to prison in many instances or deported from this
13  country, but they were used by Mr. Usmani.  They were used to
14  be on the front lines to be the ones who are far more likely
15  to get arrested.  I mean, this is an investigation that really
16  doesn't lead back to Mr. Usmani unless there is a sustained
17  long-term investigation.  Otherwise, you just see one guy with
18  a relatively small quantity of cocaine making a delivery.  So
19  that insulates Mr. Usmani.  Many of the drivers were without
20  legal status, were not financially well off, were dependent on
21  him.

22          Mr. Usmani exploited, I think it's very clear,
23  Mr. Trotter, a man in poor health as your Honor acknowledged
24  who at times was homeless.  And Mr. Usmani used him to run for
25  a very short period of time but used him to operate that drug

1    trafficking business right out of Mr. Usmani's condo.

2            He used his ex-wife and the mother of his child.  He

3    had her package narcotics for him.  He used Wesam Fattah

4    who -- you know, it's been a while since your Honor had her

5    before the Court but I'll just remind you was a woman who was

6    here without lawful status from Jordan.  Clearly, I think from

7    her statements, they're credible, didn't have any, you know,

8    involvement in drug trafficking before getting to know

9    Mr. Usmani, and he used her to run his business.  He used his

10   own brother, Nafees Usmani, who wound up being prosecuted in

11   this case, to run that business.

12           It was a business of exploitation.  The proceeds

13   overwhelmingly flowed to Mr. Usmani.  And, you know, we will

14   not ever be able to account for every penny, every dime, but I

15   think the government's version in the sentencing memo sets

16   forth where some of the money went, whether it's into

17   vehicles, into properties and, frankly, just in supporting a

18   lifestyle that -- you know, whether it's traveling to go to

19   the all-star weekend or going out to nightclubs, the money

20   gets spent, but the money was going to Mr. Usmani or to the

21   people that Mr. Usmani chose to support.

22           And I will acknowledge that he definitely chose to

23   support his ex-wife, his children, I think his immediate

24   family, his parents and his brother and to some extent as well

25   and, you know, so but it was -- there's no doubt about it, it

1    was Mr. Usmani's money to do with as he pleased.

2         It's not an offense that comes from an addiction to

3    drugs or from this very significant trauma that your Honor had

4    before you in the case of Mr. Sabih.  It's a grown man,

5    frankly a middle-aged man who had every reason to know better

6    who's doing this for self-aggrandizing reasons.  So it's a

7    very serious, very serious offense.

8         I want to spend a little bit of time just talking

9    about Mr. Usmani's history and characteristics.  I think the

10   most significant thing is that that state drug case because

11   that should have been a wakeup call.  I mean, he -- despite

12   being insulated from the consequences of his actions, he was

13   caught.  He was prosecuted and, I mean, he came out of that

14   case very well.  He came out of that case with probation and a

15   chance to, you know, put his life on the right track.  And I

16   think he even came out of it sort of a little bit removed from

17   the lifestyle in that his phone with his customers in it, he

18   had lost control of.  Mr. Cayuela had that.

19        So it wasn't a situation where he was like thrust

20   back immediately into the same lifestyle without, you know,

21   interruption, had no opportunity to reflect, no opportunity to

22   make another conscious choice.  And the conscious choice he

23   made was to rebuild his empire.  That's what he did.

24        And, I mean, there are references to this in the wire

25   affidavits but to customers where he's actually going back and

1   forth, and they're saying, "I can get it cheaper from Tony,"

2   and, you know, he's saying, "Don't mess with Tony, mess with

3   me." I mean, he's trying to win back those same customers.

4   He's trying to rebuild that business that was disrupted when

5   he was arrested by the State. That's a very deliberate course

6   of conduct that he engaged in.

7         He has, you know, other significant offenses, be it

8   the residential burglary or a prior cocaine conviction going

9   back to 2008. He was on probation, like actually under the

10   supervision of the court, while he was engaged in this

11   offense. So I think that is significant aggravation here.

12         Mr. Usmani is not a United States citizen. And so I

13   think he may be deported. As we've discussed at prior

14   sentencings, this is an aggravated felony. I don't know

15   exactly what the options are for Mr. Usmani who has lived here

16   for -- since high school essentially, so for a long period of

17   time where his family is here.

18         But I think, unlike some of the other cases where

19   your Honor viewed the risk of deportation as a significant

20   additional punishment that would warrant a reduction in

21   sentence, Mr. Usmani is not somebody who there's any reason to

22   believe would be victimized or attacked or any of the other

23   horrible consequences that potentially faced some of the other

24   defendants to come before your Honor for sentencing.

25         So I think that this is not a case where Mr. Usmani's

1   immigration, you know, situation really warrants a reduced

2   sentence.  I mean, he has made his choices.  He's made his

3   choice to engage in this conduct even though it could result

4   in him being deported.  Other members of his family have

5   naturalized.  He did not.  And so this is the position he

6   finds himself in, but I don't think that is a significant

7   factor in mitigation.

8          And regarding the firearm, I thought carefully about

9   what your Honor just said.  And I don't want to go against

10  your Honor's ruling, but I think that vignette, that back and

11  forth with the courier and then the very casual conversation

12  that followed five hours later with Mr. Cayuela, the fact that

13  a firearm was found in the home of a co-conspirator, even if

14  we are not holding Mr. Usmani responsible for that firearm for

15  the purposes of the sentencing guidelines highlights another

16  aspect of the seriousness of this offense which is that drug

17  trafficking on this scale always accompanies the potential for

18  violence.

19         I acknowledge in the sentencing memo and I want to

20  say it out loud again here today, apart from incidents of

21  domestic violence, Mr. Usmani did not use violence as part of

22  this offense, but the risk that comes around when you have

23  people moving large quantities of drugs, when you're dealing

24  with suppliers who move large quantities of drugs, when you're

25  storing large quantities of drugs, there is an attendant risk

1   to society that, you know, is part of why drug trafficking is

2   such a more serious crime than merely the possession of drugs

3   or the use of drugs.  You know, that does carry significant

4   risk.  And I respect your Honor's decision not to impose the

5   guideline enhancement, but I think that the presence of

6   firearms in this case isn't a factor that can be totally

7   ignored either.

8           So your Honor acknowledged, I think, in reaching the

9   drug quantity finding that this is a case where 3553(a)

10  factors could, you know, actually support a sentence in excess

11  of the advisory guideline range as calculated because so much

12  drug quantity, which I don't think there's any serious dispute

13  that the trafficking actually occurred.  I mean, I don't hear

14  Mr. Usmani to be walking back his post-arrest statement.

15          For the reasons I articulated earlier, I think it's a

16  well-corroborated post-arrest statement in terms of whether

17  drug trafficking on the scale that he estimated occurred.  And

18  I understand your Honor's ruling to be more focused on, can we

19  say it's sufficiently tied to this offense to count as

20  relevant conduct.

21          So in light of that, I think going up to a 120-month

22  sentence, which I believe would be the high end of the

23  advisory guideline range immediately above the one your Honor

24  just calculated -- and I'll consult my book again just to be

25  sure.  But we were at -- I'm sorry.  Yes, we are at 87 to 108,

1    so if we go just one level up, Level 28, to 97 to 121, you

2    know, a ten-year sentence, 120 months, would actually be

3    within a guideline range that's just one offense level higher

4    than the guideline range your Honor calculated.  I think a

5    sentence of that -- of 120 months would be perfectly

6    appropriate here.

7         And frankly, I do think, your Honor, it's difficult

8    in light of Mr. Usmani's recidivism, in light of the fact that

9    he was the kingpin in this case, in light of the fact that he

10   bragged about that and engaged in that conduct after having

11   been caught before, I really believe, your Honor, that it

12   would not be appropriate to go below that.  That really, I

13   think as always we're looking for a sentence sufficient but

14   not greater than necessary to meet the 3553(a) factors in this

15   case.

16        THE COURT:  All right.  Thank you.  Just on

17   co-defendant disparity, so that would be doubled basically the

18   highest other sentence because Mr. Dominguez and Mr. Allen, it

19   looks like -- well, Mr. Allen it's a definite, everyone is

20   asking for 60 months at this point.  And Mr. Dominguez,

21   there's some issue that has cropped up, but the government is

22   seeking the 60 months there.

23        So do you think the -- that doubling his is

24   appropriate?

25        MR. LAUD:  Absolutely, your Honor.  Those defendants

1    are, first of all, responsible under the guidelines but also,

2    there's not going to be 3553 aggravation evidence as to a

3    larger drug quantity presented as to those defendants.  So

4    they're, first of all, responsible for a fraction of the drug

5    trafficking.

6          Second, each of those defendants operated, you know,

7    on their own or they may have had suppliers of their own, but

8    there's absolutely no evidence that they had workers or an

9    organization underneath them.  Mr. Usmani had a very

10   significant organization underneath him involving, you know,

11   several drivers, sort of the frontline workers, as well as

12   additional people he roped in to perform specific tasks,

13   whether it's assisting with packaging or handing out the drugs

14   or handling the phones at various points in time.

15         And then, you know, the -- I mean, the -- I think

16   there will be evidence introduced as to Mr. Allen that he has

17   from time to time in his life returned to drug trafficking.

18   It is certainly not his first offense, but the evidence that

19   it was a way of life, I mean, Mr. Usmani freely admits that he

20   was deriving significant income.  He was supporting his

21   family.  He was making his music videos.  He was buying flashy

22   cars.  He was doing all of these things with the proceeds that

23   he amassed over a significant period of time with this as a

24   way of life.

25         And I think that when you factor all of those things

1    together, he's significantly more culpable than the other

2    defendants.  I did not have qualms about asking for a

3    guideline sentence when the guidelines were higher on the

4    co-defendant disparity issue, and now that we're talking about

5    a 120-month sentence, I think that that step is not at all in

6    conflict with 3553(a)(6).

7            THE COURT:  All right.  Thank you.

8            Mr. Pissetzky?

9            MR. PISSETZKY:  Maybe I should start where the

10   government finished.  That five-year disparity in sentence is

11   almost unheard of but especially in this case where it's the

12   suppliers that the government agrees to a five-year sentence

13   but the person who was supplied with the drugs, they ask for

14   more.

15           Now, I have never heard the government say in the 20

16   years that I've practiced that the suppliers who were able to

17   get kilos of cocaine supposedly, these were their only

18   transactions and they have not done this before.  I doubt if

19   it was Ron Allen's only customer.  I doubt if Mr. Dominguez

20   only provided in his drug life career 916 grams to Mr. Usmani,

21   and that's it.

22           THE COURT:  Yes, the question is whether there's

23   evidence, though, that would meet the preponderance standard

24   and is reliable of quantities beyond that.  And here, there is

25   the post-arrest statement.

1          MR. PISSETZKY:  And that's my next point.

2          Mr. Usmani was -- gave the government a statement,

3   post-arrest statement, and afterwards went in to cooperate and

4   sat down in an interview with the government and the agents

5   because he wanted to help the government, because he provided

6   them with information about other individuals, because he

7   answered all their questions.  Yet he's getting no credit and

8   the government almost ignores the fact that not only he gave a

9   post-arrest statement but he wanted to cooperate and gave them

10  other information that they could have used or not used or

11  whatever it is that they want.

12         I don't understand to this day because I have not

13  been explained why the government agreed to sit down and

14  potentially have this cooperation meeting but later on never

15  provided us with the cooperation.  I have not received an

16  answer to that, your Honor.

17         But Mr. Usmani sits here today able and willing to

18  continue to cooperate with the government which tells a lot

19  because you have to look at rehabilitation, recidivism, and

20  deterrence, specific deterrence.  And I think --

21         THE COURT:  Let me just -- do you want to put

22  anything on the record?

23         MR. LAUD:  I do, your Honor.  And I don't want to get

24  into anything that Mr. Usmani said in the proffer but I -- and

25  I don't have authority to do that either.  I think it's fair

1   to say, though, the proffer letter was very clear and the

2   statements made leading up to the proffer were very clear as

3   they always are that just coming in for a proffer is not an

4   agreement to cooperate. So I think it is clear that the

5   government has not breached any agreement with Mr. Usmani if

6   that's the suggestion.

7        I respectfully disagree with Mr. Pissetzky's

8   statement that it wasn't explained to him why Mr. Usmani did

9   not get a cooperation reduction. It was explained to him both

10   by the attorneys assigned to this matter. He also came in and

11   met with the criminal chief in the office and pitched a

12   cooperation deal, and that was rejected and there was an

13   explanation that followed that.

14        THE COURT: All right.

15        MR. LAUD: And I just -- I don't believe that

16   Mr. Usmani based on that proffer put himself in a situation

17   where we could use him as a cooperator. I'm not asking that

18   the proffer be held against him. I'm asking that he do get

19   credit for having been forthright with the government in his

20   post-arrest statement, but the government is not making a 5K

21   motion here, and we're not making a 5K motion in good faith

22   just as we met with Mr. Usmani in good faith.

23        And so I don't see how that can be a reason to

24   essentially say that the government has taken advantage of

25   Mr. Usmani in some way by having him sit down for that

1    proffer.

2            MR. PISSETZKY:  Your Honor, I did not say that the

3    government breached their agreement with Mr. Usmani, but

4    obviously Mr. Usmani didn't breach his agreement with the

5    government where he was supposed to be and was truthful with

6    the government and --

7            THE COURT:  All right.  But you are saying that

8    you've never been given an explanation.  The government says

9    that you have.  They're obviously trying to not put things on

10   the public record that might actually harm him.  So I take

11   your point that he came in and he tried to cooperate.  And I

12   will take that into account.  So you can move on to the next

13   argument.

14           MR. PISSETZKY:  And so when you look at avoiding

15   disparity in sentencing, such a disparity is not warranted in

16   this case.  And we're asking for the five-year mandatory

17   minimum which is the same amount of time that the government

18   is asking for the suppliers in this case.

19           Now, as far as his criminal history, your Honor,

20   Mr. Usmani never did any prison sentence.  So a five-year

21   prison sentence is going to be a very long prison sentence for

22   Mr. Usmani.  He received -- like the government said and as

23   you see in the PSR, he received probation for his prior

24   charges and prior acts, and that is the reason why he was in

25   criminal history III, and that's the reason why he got -- he

1    received two more points when you calculated the criminal
2    history for being on probation when he committed this crime.
3        And so that has been taken into account already when
4    you calculate the criminal history.  He is in criminal history
5    III.  And when you look at his criminal history and you see
6    that he has not been in prison before and this is going to be
7    his prison sentence, a 60-month sentence is a very long
8    sentence.  And that's what we're asking for.
9        Mr. Usmani, his parents -- he was born in
10   Afghanistan.
11       THE DEFENDANT:  Yes.
12       MR. PISSETZKY:  And when he was five, his parents
13   left to come to the United States but left him behind where he
14   was left with an aunt and uncle that were supposed to take
15   care of him but did not take care of him and, in fact, abused
16   him.
17       Once he arrived here in the United States around the
18   age of 10, not during high school but at the age of 10, he was
19   put in a scenario that he was -- he had to take care of his
20   siblings because his parents would be working all day long.
21   So from a very young age, he was abused and then put in a
22   scenario where he was supposed to become an adult at almost
23   the -- around the age of 10.  Despite that, your Honor, he was
24   an honor roll student when he was in school.  And you heard he
25   just received his GED now.

1          And he is a successful musician.  And recently before

2    his arrest, in a way he became a You Tube sensation when he

3    came out with a song with a very well-known rapper, Twista.

4    So the potential for rehabilitation that Mr. Usmani has is

5    enormous.

6          He does have -- so when he married Lisa, Lisa had

7    three kids.  And he basically took them and raised them as if

8    they were his own.  And then they had two more biological

9    children.  The turning point, unfortunately, for Mr. Usmani in

10   his life was when they lost their son shortly after he was

11   born.  That's when his marriage to Lisa spiralled.  That's

12   when he started drinking heavily, started using drugs like

13   marijuana and cocaine.

14         They eventually divorced at 2014 but at that point,

15   they had financial trouble.  They didn't even have money to --

16   for the funeral of the burial for their young son that just

17   passed away.  And it took a great toll on Mr. Usmani

18   psychologically, physically, and emotionally.  And that's when

19   things started going downhill for him, unfortunately.

20         Now, when Mr. Usmani -- and the government is

21   describing the people that worked with Mr. Usmani as his

22   victims as well and that he exploited them.  Look, they're all

23   adults.  They were all adults that knew Mr. Usmani.  It was

24   his brother.  It was his ex-wife.  It was his girlfriend.

25   They went into it with their eyes open.  And they went into it

1    willingly and not being exploited.  They're all adults that

2    made decisions.  They all -- they're all adults that, as

3    Mr. Usmani was helping the family, they were working together,

4    unfortunately.

5            So it's -- he is not different than them and they are

6    not different than him in that perspective which also goes

7    into avoiding disparity in sentencing.  When Mr. Usmani wasn't

8    in Chicago around the month of February of 2018, his brother

9    took over.  His brother and Mr. Trotter took over the drug

10   dealing.

11           They had a choice.  They didn't have to do that.

12   Mr. Usmani was never violent.  Mr. Usmani was not violent

13   against them.  Mr. Usmani did not have guns.  Mr. Usmani did

14   not threaten them to do it.  They did it.  And so when you're

15   sentencing Mr. Usmani, you have to look at disparity in

16   sentencing as they are compared to these individuals as well.

17           As far as recidivism and rehabilitation and the

18   future for Mr. Usmani, your Honor, he did cooperate, as I told

19   you.  He is working on changing his life.  He has gotten his

20   GED.  He has worked very hard at the MCC to better himself.

21   He has a very loving and supportive family that is still here,

22   and they're all in the courtroom.

23           And most importantly, despite being here since the

24   age of 10, Mr. Usmani will be deported.  And I'm not sure

25   where the government gets their information, but he was born

1    in Afghanistan.  He will be deported back to the country that

2    he was born in, despite the fact that his entire family is

3    going to stay here because they're citizens here.  And when

4    they arrived here, they arrived here on a political refugee

5    asylum.  So he will be sentenced and then deported to a place

6    where he does not know anybody, has no family.  And his

7    family, in fact, escaped from there because they were

8    persecuted.

9         MR. LAUD:  Your Honor, can I just ask for a point of

10   clarification?  My understanding from the PSR and the

11   investigation is that Mr. Usmani is a citizen of Pakistan and

12   that he was born in Afghanistan but the Pakistani citizens, in

13   fact, a Pakistani diplomat, I believe, or somebody -- you

14   know, his father had some role in the government and that as a

15   result, he has Pakistani citizenship and that they later

16   traveled to Yugoslavia and to the United States.

17        So I am not aware of any indication that Mr. Usmani

18   would be -- has any claim to Afghani citizenship or would be

19   sent to Afghanistan.  And if that is the case, I'd just like

20   to make sure that that's well developed for the record.

21        MR. PISSETZKY:  So, your Honor, Mr. Usmani was born

22   in Afghanistan.  He is -- was not a Pakistani citizen.  His --

23   and currently, he is a green card holder that gets extended

24   every ten years because of his status as a political refugee.

25   However, at this point, he cannot become a United States

1   citizen.  So by operation of law, he will be deported to the

2   country that he was born in, which is Afghanistan.

3           THE COURT:  Well, he would be returned to the country

4   where he holds citizenship, and you're saying that he does not

5   hold Pakistani citizenship.

6           MR. PISSETZKY:  Correct.  That's based on the

7   information that I have.  In fact, I don't think he -- at this

8   particular time, he doesn't have a passport or hold

9   citizenship anywhere in the world except for a visa or a green

10  card from the United States.  And he has never visited --

11          THE DEFENDANT:  Pakistan or Afghanistan.

12          MR. PISSETZKY:  -- these countries in his life.  He's

13  been here.  So the sentence that -- whatever sentence you're

14  going to give him, your Honor, when he gets deported, he is

15  going to go to a completely foreign country where as we all

16  know, whether it's Pakistan or Afghanistan, the conditions in

17  either place are not ideal.

18          THE COURT:  Yes.  Well, he did live in Pakistan

19  before immigrating here.

20          THE DEFENDANT:  When I was --

21          MR. PISSETZKY:  When he was before ten -- between the

22  age of zero and ten.

23          THE COURT:  Right.

24          MR. PISSETZKY:  Yeah.  So, I mean, he is a lot older

25  today, Judge.

1          THE COURT:  Yes.

2          MR. PISSETZKY:  All right.  So the sentence is going

3    to be very, very harsh because this is his family.  They're

4    all here, Judge.

5          Now, finally, I want to talk about his health and our

6    current situation, which is the COVID situation.  And it's a

7    very scary situation.  We're all sitting here in court at

8    least six feet apart.  We all are wearing masks.  There are

9    COVID-positive people, thousands of them, every day and just

10   recently in this courthouse, a couple days ago, I believe.

11         The CDC has -- if you go on the CDC website,

12   cdc.gov/coronavirus, there is a very handy chart that

13   indicates factors that increase community spread and

14   individual risks, COVID-19 associated hospitalization related

15   to underlying medical conditions.  And it indicates that

16   crowded situations, as we know, increase the risk of

17   individual risk and hospitalization.  Close physical contact

18   increases it.  In close places increases it and duration of

19   exposure.

20         These are the normal -- these are the main four

21   factors.  As you know, all these factors exist in a prison.

22   There's no way to avoid crowded situations, close physical

23   contact in close places and a very long duration of exposure

24   if your Honor is even going to sentence Mr. Usmani to a year.

25         Then the CDC says, risk for hospitalization if you

1    have any of these conditions and get COVID compared to people

2    without these conditions.  And it lists the conditions that

3    increases the risk of COVID and hospitalization beyond the

4    first four that I provided you with.  And hypertension, which

5    Mr. Usmani is suffering and is taking medication for,

6    increases the risk by three times.  Obesity increases the risk

7    by three times.  And diabetes, again which Mr. Usmani has,

8    increases the risk by three times.

9          So Mr. Usmani has three of these conditions that

10   further increases the risk by three times, but the CDC says

11   that if you have three or more of these conditions, your risk

12   is increased by five times at least of getting hospitalized or

13   being hospitalized due to COVID and possibly suffering severe

14   consequences from it; if not death, then very long-lasting

15   consequences.  Mr. Usmani is obese.  Mr. Usmani has

16   hypertension.  And Mr. Usmani has diabetes.

17         Your Honor, I cannot ask you for to give him less

18   than five years because that's the mandatory minimum.  Any

19   sentence -- and under 3553, you have to consider, one of the

20   things that you must consider is whether or not they'll be

21   able to sufficiently provide him with medical care and keep

22   him safe.  The answer is no.

23         And so in addition to thinking about disparity in

24   sentencing, thinking about lack of recidivism here, the fact

25   that he cooperated, the fact that he did have a very traumatic

58

1  life and now will be deported which will continue to make his

2  life even more dramatic, you have to look at the medical

3  condition and the lack of safety that the Bureau of Prisons

4  will be able to provide for Mr. Usmani because we don't have a

5  vaccine.  And prisons are dangerous.

6          And so, your Honor, I would ask you to sentence

7  Mr. Usmani to, unfortunately, the only -- the minimum that you

8  can, which is 60 months.

9          THE COURT:  All right.  Thank you.

10          Before we get to the allocution, let's talk about the

11  supervised release conditions.  Even though deportation is

12  virtually guaranteed, there's a mandatory minimum, so we still

13  have to go through it.

14          MR. PISSETZKY:  Unless you find that supervised

15  release will not be necessary.

16          THE COURT:  I think because of the mandatory minimum,

17  I have to.  This is one of those -- if there's no mandatory

18  minimum, I think I can say, yes, I'm not going to impose any

19  supervised release, but I think I have to because there's a

20  mandatory minimum.

21          MR. PISSETZKY:  I'm not sure.  I don't know.  Maybe I

22  misread the way that the Seventh Circuit ruled on that --

23  those issues.  But I thought that you can waive it if we think

24  that he will be deported.  However, I don't have any

25  objections to these conditions because --

1         THE COURT:  Okay.  He's not going to serve them?

2         MR. PISSETZKY:  Right.

3         THE COURT:  Well --

4         MR. LAUD:  Your Honor, what I propose then is we

5    could have a sort of bare bones set of conditions including, I

6    believe there's a special condition -- although he would

7    likely be deported directly from prison -- about, you know,

8    cooperating with any removal.  And then, you know, I don't

9    know that we need to go through each and every condition.  If

10   that --

11        THE COURT:  Okay.

12        MR. LAUD:  -- changes, I suppose we could always come

13   in and ask that his conditions of supervised release be

14   modified.

15        THE COURT:  All right.  Well, let me ask the

16   probation office, if there's a mandatory, statutory mandatory

17   minimum, I do have to impose a term of supervised release,

18   right?

19        PROBATION OFFICER FOWLIE:  That would be my

20   understanding as well, your Honor.

21        THE COURT:  Okay.  So let's do this --

22        PROBATION OFFICER KIRIKLAKIS:  Your Honor, Kathy

23   Kiriklakis, U.S. Probation.  On Page 24 at Paragraph 103, 102

24   and 103, I list the statutory and the guidelines range for

25   supervised release.  It is required in this case.

1          THE COURT:  Yeah.  I'm pretty sure I can't waive it.

2     However, given that deportation is basically guaranteed, let's

3     do this.  On the mandatory conditions, Mr. Pissetzky, do you

4     have any objections to -- this is on Page 24.

5          MR. PISSETZKY:  No.

6          THE COURT:  1 -- okay.  1, 2, 5, and 6.

7          MR. PISSETZKY:  No objection.

8          THE COURT:  All right.  So those will be imposed.

9     And there is a prior cocaine use which justifies No. 6.

10          Then let's just go ahead and turn to Page 27.  Is

11     there any objection to No. 21?

12          MR. PISSETZKY:  No.

13          THE COURT:  All right.  So 21 will be imposed so that

14     the defendant will surrender to a duly authorized official of

15     the Homeland Security Department for a determination on the

16     issue of deportability by the appropriate authority in

17     accordance with the laws under the Immigration and Nationality

18     Act and the established implementing regulations.  If ordered

19     deported, you shall not reenter the United States without

20     obtaining in advance the express written consent of the

21     Attorney General or the Secretary of the Department of

22     Homeland Security.

23          Okay.  And then I think we can just hold off on

24     everything else.

25          PROBATION OFFICER KIRIKLAKIS:  Your Honor, if I may,

1    again, Kathy Kiriklakis, U.S. Probation.  We have had a few

2    instances where individuals were not automatically deported

3    and I believe were released on some sort of immigration bond.

4         If possible, could we please request discretionary

5    condition 15 that he shall report to the probation office just

6    in case for some reason Immigration does not automatically

7    report to him -- to deport him so we can know where he is.

8              THE COURT:  Okay.  All right.  We'll add that one as

9    well.  All right.  Thank you.

10             PROBATION OFFICER KIRIKLAKIS:  Thank you.

11             MR. LAUD:  And, your Honor, just so the record is

12   clear, I think it is, if that were the case, the government

13   might file a motion to impose sort of additional conditions,

14   the ones necessarily attendant to supervision like, you know,

15   meeting with the probation officer, reporting contact with law

16   enforcement.  And so I just want to make clear I'm not waiving

17   the idea that that those are needed if he's on supervised

18   release.

19             MR. PISSETZKY:  That's understood, your Honor.

20             THE COURT:  Yes, that's fine.  If he makes bond then,

21   of course, I would expect a motion.

22        Okay.  Mr. Usmani, now is your time to speak on your

23   own behalf.  So you may go ahead and do that.

24             THE DEFENDANT:  Your Honor, I have prepared a letter.

25             THE COURT:  All right.  Go ahead.

1          THE DEFENDANT:   To the most Honorable Judge Edmond

2    Chang, thank you, your Honor, for granting me the time and

3    opportunity to show this Court how remorseful I am for my

4    actions which led us all here today before you.

5          With respect to this court, your Honor, I would like

6    to address my family and all who are present.  Your Honor, I

7    stand before you guilty for my actions, guilty for my

8    decisions, and guilty for all my wrongdoings.  I disregarded

9    sound advice from those I love and chose a path of

10   self-destruction, a path that I'm truly ashamed of today.

11         I cannot go back and turn back the hands of time, but

12   I can assure you that I will do my best to educate my children

13   and the youth in my community and prevent them to ever follow

14   the path I was on and persuade them to make lifestyle choices

15   for their betterment as individuals and to become productive

16   members of our society.  At this point, all I can do is

17   respectfully hope that this Court will be satisfied with this

18   judgment in my case and know that without a shadow of a doubt

19   how truly sorry I am because I really am sorry, your Honor.

20         I'm sorry for not doing better in making poor life

21   choices.  I was ignorant and arrogant.  I involved my friends

22   and family.  I involved the mothers of my children.  It was

23   because of me and me alone that my whole family has gone

24   through a tremendous amount of pain and suffering.  I caused

25   enormous embarrassment.  And this weighs really heavy on my

1    soul.   And I do not want to be known to my friends and family

2    as an outcast for all that I have done and indulged in.   And I

3    look forward to the day I can redeem myself in my family's

4    name.

5          Your Honor, being incarcerated for the past 22 months

6    has not only saved my life from the drugs and alcohol, it has

7    also brought me closer to my god, Allah, and my religion.   I

8    have fasted for the months of Ramadan and prayed five times a

9    day asking for forgiveness for my sins and my deeds.

10         While incarcerated I participated in programs such as

11   Parenting for Fathers, Total Body Fitness, and I completed my

12   GED, your Honor.   I have also taken this time to reflect what

13   I want to accomplish in life.   I have set my goals that I will

14   pursue by hard work and effort.   I have taken personal

15   inventory of everything I will change in my life.   Although

16   change does not come overnight, it is a slow process, and as

17   painful as it might be, it is very essential for my growth and

18   development into a new man, a pursuing man with dedication and

19   purpose, goal oriented and determined to be better, for I can

20   live a precise life and provide for my children.

21         Your Honor, I ask that you consider my future and

22   respectfully grant me the opportunity to show you better than

23   I can tell you what I intend to accomplish in my future.   All

24   I need is for this Court to grant me the tools necessary to

25   reach my goals whether it be programs that fit my needs or

1  whatever this court deems appropriate for me to participate

2  in.

3  My future is in your hands, Judge Chang.  Please

4  grant me leniency and give me a chance to do right by my

5  family and help me become a man of great integrity and honor.

6  Thank you, Judge.

7  THE COURT:  All right.  Thank you, Mr. Usmani.

8  MR. PISSETZKY:  May I run to the restroom real quick?

9  THE COURT:  Yes, you may.

10  (Pause.)

11  THE COURT:  All right.  We're back on the record.

12  Mr. Usmani, federal law tells judges what we have to

13  consider in picking a sentence.  I do have to consider the

14  nature and circumstances of the crime that you committed.  And

15  I consider your personal history and background.

16  Then I'm supposed to try to achieve certain goals of

17  sentencing and pick a sentence that is enough but not more

18  than necessary to achieve those goals.  The goals include

19  providing for just punishment.  The sentence must reflect the

20  seriousness of the crime.  I have to try to promote respect

21  for the law.  I also have to try to provide for something

22  that's called deterrence.  And there are two forms of that

23  under the law:  General deterrence, which is just sending a

24  message out generally to the public to not commit this kind of

25  crime; and then specific deterrence, which is giving a

1  sentence that is enough to specifically encourage you to not

2  commit any other crimes.

3        I have to consider the protection of the public.  I

4  consider needs like rehabilitative, medical, vocational needs.

5  That can only ever push a sentence down, though.  That can't

6  ever be a reason that a sentence gets higher.

7        I have to consider the advice of the sentencing

8  guidelines.  I have to try to avoid unwarranted disparities.

9  And you've heard a little bit about that today.  I ought to

10  treat you the same way I treat anyone else with the same kind

11  of personal history that you have and has committed the same

12  kind of crimes that you have committed.  And it also means

13  that when sentencing you relative to the other defendants in

14  the case, I am trying to just slot everyone into the right

15  spot in terms of culpability and all the other relevant

16  factors.  So those are all the goals and factors that I have

17  to consider in picking a sentence.

18        On the nature and circumstances of the crime, it is a

19  serious crime.  What you're being held responsible under the

20  sentencing guidelines is for a little over two kilograms of

21  cocaine.  And because each individual dose of cocaine is about

22  a tenth of a gram, that represents thousands and thousands of

23  individual doses.

24        And you just think about the extreme societal harms

25  that drug use has on our society at large, but you think about

1   it on the individual basis.  That means thousands of times

2   that someone used this substance, this poisonous substance and

3   worked harms on their personal lives, on their professional

4   lives, and on the lives of their families.  So this is why

5   drug dealing is just a very serious crime, and it's one that

6   we have been dealing with for decades and decades and probably

7   will be fighting for decades to come.

8           You also, I do believe that you did deal in much more

9   than just the two kilograms that I found you responsible for

10  under the guidelines.  You did make this post-arrest

11  statement.  There is a reason why we usually credit what's in

12  a post-arrest statement because you are speaking against your

13  very own interest, so you have every reason, if you're going

14  to make an admission against yourself, to speak truthfully

15  about that and to not exaggerate.

16          So in the most defendant-friendly, the most innocuous

17  interpretation of your post-arrest statement, from 2008 for

18  about ten years on and off, you sold on average four ounces of

19  cocaine a week.  And, you know, as the probation officer had

20  proposed, if we just take one-fifth of that time, then you

21  sold in this time period something around 10 kilos, maybe 11

22  kilos of cocaine.  That's not in addition to the 2.1.  This is

23  a grand total.

24          And I do take that into account when I consider

25  things like your risk of repeat offense because you had been

1   doing this, on and off to be sure, but you had been doing this

2   on and off for over a decade by the time that you got caught.

3   And so this is part of your personal history, too, that you

4   were willing to sell this -- that quantity of drugs over that

5   quantity of time.

6          Now, having said that -- and this is kind of a sad

7   and tragic point to make these days, it just shows you the

8   extent of the drug crime in our country -- 10 or 11 kilos over

9   10 years is not the most prolific drug dealer actually.  It's

10  one kilo a year basically which again as a grand total, it is

11  very serious.  It is, sad to say, not very prolific when it

12  comes to federal court cases.

13         All right.  Leaving the drug quantity, you are the

14  most culpable defendant in this particular case because you

15  are the organizer and leader of this drug business.  It really

16  was a drug business.  It's getting supplies of a good and then

17  selling that good and then delivering that good and then

18  picking up money for those deliveries.  It was a drug

19  business, and you organized and you led it.

20         Mr. Pissetzky says, well, you should be on about an

21  equal level of culpability with the suppliers, but no.

22  Sometimes suppliers are sentenced to less time than those to

23  whom they sell because of various circumstances, and many of

24  them apply here.  One is you did organize this drug business,

25  and so that is more damaging to society because you were able

1    to create this efficient operation of drug dealing.

2          Second is your criminal history.  That does factor

3    into the -- your culpability here.  And so there are a variety

4    of reasons, some of which I will talk about, in aggravation

5    where a drug seller may very well get more than their

6    supplier.

7          With regard to your co-defendants, I have now

8    sentenced ten of them with Mr. Allen and Mr. Dominguez coming

9    up.  And the way I see you and your co-defendants, there are

10   basically two lower-level tiers of sellers and couriers and

11   also people who helped out just for a week or so.  And so many

12   of those, the defendants in the lower-level tier got sentences

13   of a day or just a few months.

14         And then there's another tier that they were getting

15   about a one-and-a-half-year sentence.  And then there is

16   Mr. Allen and Mr. Bowens and Mr. Dominguez, basically

17   suppliers.  And then there's you at the top.  And you are at

18   the top here.

19         Mr. Allen and Mr. -- well, Mr. Allen for sure,

20   essentially as certain as I can be, is heading for a 60-month

21   sentence because everyone is asking for that at this point.

22         Mr. Dominguez, it looks like he's going to try to ask

23   for under the 60 months but, you know, as far as I can

24   estimate, based on the 916 grams that he has sold, even if he

25   is safety valve eligible, he would most likely receive

1    something in that neighborhood.

2         And so I am keeping an eye out for the fact that what

3    the government has requested would be double the sentence of

4    anyone else in the case.  And so I do take that into account

5    in mitigation, but please let there be no mistake that you are

6    the most culpable defendant in this case.

7         Mr. Pissetzky talks about the others who are involved

8    and that they were adults, they made their own decisions.

9    Here's the thing.  Nafees Usmani, your brother; Steven Trotter

10   who was homeless and needed a place to stay and had very

11   serious health issues; Lisa Usmani; Wesam Fattah, yes, they're

12   adults and they make their own decisions.  They would not have

13   committed a drug crime if you had not asked them.

14        And that's based on all four of those individuals.  I

15   sentenced them.  I've looked at their character and their

16   past.  They would not have committed these crimes without you

17   asking them.  So that is how you are more culpable in getting

18   them involved, despite the fact that, of course, they're

19   adults and they made adult decisions, and they paid a price

20   for it.

21        You did plead guilty to the crime.  You have accepted

22   responsibility.  Now, when I look at your personal history, it

23   does include your criminal history.  It would be naive of me

24   to think that despite the rehabilitative steps that you've

25   taken -- and I do think that you should be praised for taking

1   those steps, earning the GED.  Those are important steps to

2   take.  But I do have to look at your criminal history too.

3   And it does include a prior conviction for possessing more

4   than 15 grams of cocaine.  And it even includes a conviction

5   for delivery of cocaine for which you were on probation at the

6   time that you committed this offense.  And I'm afraid that

7   that tells me that there is a very serious risk that you would

8   reoffend if I gave you too low of a sentence.

9           It's true, you haven't done any time in custody but

10  for many defendants, walking into that state court -- well,

11  getting arrested in the first place for drug dealing let alone

12  then being prosecuted and found guilty for it and getting a

13  sentence for it, even a noncustodial one, would be a shock to

14  their system and that would be the end of it but

15  unfortunately, that is not what happened with you.

16          Now, on your personal history, your upbringing was

17  obviously very difficult.  There was an abusive -- you

18  suffered from an abusive environment, but I don't see a direct

19  connection between that upbringing and when you were over 40

20  years old and you committed this offense.

21          The written filing mentions another very serious

22  trauma in your life in losing your infant son.  I -- and no

23  doubt, that is traumatic.  The connection between that tragedy

24  and this offense, I again don't see very much of a connection

25  there.  I don't think that's where you turned down -- you

1  started going downhill and started selling drugs.  Tragically,

2  many families encounter that kind of tragedy without them

3  turning into a substantial drug dealer.  So I don't think

4  that's particularly mitigating.

5        Now, you have contributed greatly to your family.

6  Obviously, many have written letters in support, and your

7  siblings, too, are still standing by you.  So that's to your

8  credit that your family is still supportive.  It speaks to the

9  fact that you were supporting them and provided both financial

10  and emotional support.

11        MR. PISSETZKY:  Your Honor, I'm sorry to interject.

12  But Mr. Usmani lost his son around 2005.  And that's where his

13  downward spiral started.  And I do believe that it has a

14  direct connection because that's when he started using drugs,

15  abusing alcohol, and that's what led to him starting selling

16  drugs.

17        THE COURT:  Well, I said that he said that he started

18  selling around 2007 or 2008.  And, of course, it is a tragic

19  event, and no doubt he was affected by it.  But as I said,

20  most people do not then turn into substantial drug dealers for

21  a decade based on a tragedy like that.  So I do not believe

22  that there is a direct connection, and it is not mitigating in

23  light of the fact that people, most people do not turn into a

24  drug dealer based on that.

25        With regard to the family separation, that is also

1   the most difficult part of any sentencing. The fact that you

2   are separated from your daughter and your son, your

3   five-year-old son who has, you know, special needs, it was

4   heartbreaking to read the letters written by one of your

5   sisters and your daughter wrote a letter, and it was

6   heartbreaking to read them describe how your son has been

7   reacting and affected by your absence.

8        I believe your sister wrote about how sometimes he'll

9   wake up in the middle of the night just calling your name.

10  That is -- it is absolutely heart wrenching. And I take into

11  account that you are being separated from them. And of

12  course, you have a one-year-old, a very young son with your --

13  with Ms. Fattah. And so I take into account the family

14  separation.

15       It must be said, not to take away from your

16  contributions to your family and not to take away from how

17  hard it is going to be to be -- continue to be separated from

18  them, but it must be said that it is -- it's a product of your

19  choices that you made. And people who deal in this kind of

20  quantity of drugs, they have to realize that that means

21  there's going to be family separation which you've been

22  suffering through these last almost two years.

23       There is hope for rehabilitation. I think you did

24  well in school. You had this music career going. And I think

25  anyone who can organize -- use their intelligence and work

1  ethic to organize this drug business can use it for positive

2  things.  So there is some rehabilitative hope, and I take that

3  into account.

4          The deportation is somewhat mitigating here.  Assume

5  the worst and that you would be deported to Afghanistan then,

6  you know, obviously life is going to be very difficult over

7  there.  You will be separated.  It's not going to be easy to

8  travel, even for your family to travel there to visit you.  So

9  I do take that into account.

10          It's not quite as mitigating, though, as some of your

11 co-defendants who for reasons that are under seal, although

12 you might know about them, are going to face really difficult

13 circumstances returning to their countries of origin, but I do

14 take it into account.

15          On general deterrence, I just want to -- I'll just

16 say a few words on this.  Your lawyer argued in the written

17 filing that these social science, social scientists have

18 determined that there's more deterrence effect in terms of

19 sending a message out to the community if a punishment is

20 certain rather than lengthy.  And I've read, you know, these

21 studies.

22          And I don't think, first of all, that these studies

23 establish that the length of a sentence has no general

24 deterrence effect.  It's just comparatively these social

25 scientists believe that certainty has more of a deterrence

1   effect, not that there's zero deterrence effect in a lengthy

2   sentence.

3           And really, the social scientists, they're making an

4   argument not so much to judges I think, but the argument

5   applies more to policymakers, that if you put more money into

6   policing and increase the chances of detection, that will have

7   a better deterrent effect than just imposing long sentences.

8   So it's not really something that I think is persuasive to me

9   in picking individual sentences.

10          Also, these studies, it is really hard to study

11  general deterrence.  The studies involve things like, well, if

12  we tell everyone who violates a condition of probation they

13  would definitely get two days in jail, then they study the

14  effects.  I think it was in Hawaii.  And it looked like it had

15  a better deterrent effect.  That, that there was a certain two

16  days as opposed to an uncertain longer period of time, I don't

17  know what conclusions to draw from that.  And so it's -- and

18  other studies rely on comparing juveniles who are like 16 or

19  17 and then people who are just young adults at 18 and the

20  differences in deterrence there because juveniles tend not to

21  get prison sentences.

22          Again, I don't know what inferences to draw from

23  that.  So I really think the social scientists have not made

24  the case that general deterrence does not work.  And when I

25  say "general deterrence," it's not because the *Tribune* or

1   *Sun-Times*, they're not here, of course, but it's just the

2   people who know you, you know, your community.  Every

3   defendant, their family and their friends and so on, they know

4   what the sentence is.  And so that is where you could have

5   general deterrence effect even if it's not a high-profile

6   case.

7          And lastly, I have no doubt that if it became known

8   that the federal judges in the Northern District of Illinois

9   were giving slaps on the wrist for drug crimes that drug

10  crimes would increase.  So I do have to account for general

11  deterrence.

12         Lastly, your medical condition.  I am concerned with

13  the fact that you have these risk factors for COVID risk.  And

14  although I didn't see the obesity actually in the presentence

15  report, you know, just from your height and weight, I can

16  understand why Mr. Pissetzky maybe is making that argument.

17  So I do take into account the risks of COVID and its impact on

18  you.

19         Even more generally, I have been giving every

20  defendant basically a discount for the fact that we're in the

21  middle of a pandemic.  And I do believe that the BOP is

22  getting better, as all society is or at least all society is

23  learning how to deal with the pandemic better and try to

24  control it including in the prison setting, but some of these

25  controls make prison harder now.  Like, prison time is harder

1    now than -- during a pandemic than even if you don't catch

2    the -- you don't get infected.  So I take that into account.

3    And then again, you specifically have more of these risk

4    factors.

5            I do have to reflect the seriousness of this crime,

6    though, that you committed, the fact that you organized and

7    led all of these other defendants and got some of them

8    involved and they otherwise would not have been involved.  I

9    have to account for the recidivism risk and the need for

10   deterrence, both general and specific.

11           So based on that, I do believe the appropriate

12   sentence is a sentence of 96 months of imprisonment.

13           Supervised release will be the mandatory minimum of

14   four years with the conditions that we discussed previously.

15           I will not impose a fine.  I don't have a lot of

16   information on the financial condition, but at least based on

17   the credit report and other public databases, it does not

18   appear like Mr. Usmani has the ability to pay a fine.  I do

19   have to impose the $100 special assessment.

20           If you are going to appeal the sentence, you must

21   appeal within 14 days of entry of judgment on the docket.  If

22   you can't afford the fees or costs of appeal, then you just

23   ask to have them waived.  And if you can show that you can't

24   pay them, then they'll be waived.  If you can't afford an

25   attorney on appeal, you can ask to have one appointed free of

1    charge.  And again, if you can show that you can't afford one,

2    one will be appointed free of charge.

3           I will recommend the RDAP program.  I'm not sure he

4    will qualify, but I will recommend that in light of the prior

5    substance abuse.

6           Is there a facility recommendation?

7           MR. PISSETZKY:  Something close to Chicago, your

8    Honor.  I'm not sure where he's going to be qualified.

9           THE COURT:  All right.  I'll ask that the BOP as

10   close to Chicago as possible.

11          All right.  Is there anything else for the

12   government?

13          MR. LAUD:  Just two matters, your Honor.  One, the

14   government -- and I apologize because it was just filed this

15   morning.  There's forfeiture alleged in the indictment that

16   follows from the events of conviction.  So we filed a motion

17   for the preliminary order of forfeiture.  And so we'd like

18   that order entered.

19          And there may be -- there were some administrative

20   claims filed with respect to one of the vehicles, so there

21   may -- if those people choose to persist in the claim, there

22   may be a further proceeding in front of your Honor with

23   respect to those, but we would seek that preliminary order of

24   forfeiture be entered.

25          And then there are two remaining counts of the

1    indictment, Counts 2 and 3, that the government would move to

2    dismiss.

3              THE COURT:  All right.  Those counts are dismissed.

4              Do you have any objection to the preliminary order of

5    forfeiture?

6              MR. PISSETZKY:  No, your Honor.

7              THE COURT:  All right.  That will be entered as well.

8              Okay.  Anything else for the probation office?

9              PROBATION OFFICER FOWLIE:  No, your Honor.

10             THE COURT:  And Mr. Pissetzky?

11             MR. PISSETZKY:  No, your Honor.

12             THE COURT:  Okay.  Ms. Kiriklakis, is there anything?

13             PROBATION OFFICER KIRIKLAKIS:  Your Honor, I will

14   prepare a statement of corrections with the Court's guideline

15   findings.  And I understand there will also be a corrected

16   presentence report.  And I will wait for notes and additional

17   information from Officer Fowlie and Mr. Pissetzky.

18             THE COURT:  Okay.  Very well.  Thank you.

19             All right.  So, Mr. Usmani, good luck to you.  And

20   this sentencing is adjourned.

21        (Proceedings adjourned at 5:07 p.m.)

22

23

24

25

1           C E R T I F I C A T E

2           I, Judith A. Walsh, do hereby certify that the

3    foregoing is a complete, true, and accurate transcript of the

4    proceedings had in the above-entitled case before the

5    Honorable EDMOND E. CHANG, one of the judges of said court, at

6    Chicago, Illinois, on September 30, 2020.

7

8    */s/ Judith A. Walsh, CSR, RDR, F/CRR_____*          June 10, 2021

9    Official Court Reporter

10   United States District Court

11   Northern District of Illinois

12   Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25